COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Fitzpatrick, Judge Kelsey and Retired Judge Stephens[*]
Argued at Chesapeake, Virginia


THE MATTAPONI INDIAN TRIBE,
 CARL T. LONE EAGLE CUSTALOW,
 ASSISTANT CHIEF

v.              Record No. 2338-03-1

COMMONWEALTH OF VIRGINIA
 DEPARTMENT OF ENVIRONMENTAL QUALITY,
 *ex rel.* STATE WATER CONTROL BOARD,
 ROBERT G. BURNLEY, DIRECTOR & EXECUTIVE SECRETARY,
 AND CITY OF NEWPORT NEWS

                                                        OPINION BY
ALLIANCE TO SAVE THE MATTAPONI,            JUDGE D. ARTHUR KELSEY
 CHESAPEAKE BAY FOUNDATION, INC.,                 AUGUST 31, 2004
 MATTAPONI AND PAMUNKEY RIVERS ASSOCIATION,
 SIERRA CLUB, PAULETTE P. BERBERICH
 AND WARREN MOUNTCASTLE

v.              Record No. 2469-03-1

COMMONWEALTH OF VIRGINIA,
 DEPARTMENT OF ENVIRONMENTAL QUALITY,
 *ex rel.* STATE WATER CONTROL BOARD
 ROBERT G. BURNLEY, DIRECTOR & EXECUTIVE SECRETARY,
 AND CITY OF NEWPORT NEWS


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Robert W. Curran, Judge Designate

David S. Bailey (Curtis Berkey; Hope M. Babcock; Eric D. Albert;
Saikat Chatterjee, Law Student Intern; Charles Beene, Law Student
Intern; David S. Bailey, P.L.L.C.; Georgetown University Law
Center Institute for Public Representation, on briefs), for appellant
The Mattaponi Indian Tribe, Carl T. Lone Eagle Custalow, Assistant
Chief.

---

[*] Retired Judge J. Warren Stephens took part in the consideration of this case by
designation pursuant to Code § 17.1-400.

Deborah M. Murray (Southern Environmental Law Center, on briefs), for appellants Alliance to Save the Mattaponi, Chesapeake Bay Foundation, Inc., Mattaponi and Pamunkey Rivers Association, Sierra Club, Paulette P. Berberich, and Warren Mountcastle.

Rick R. Linker, Assistant Attorney General (Jerry W. Kilgore, Attorney General; Roger L. Chaffe, Senior Assistant Attorney General, on briefs), for appellee Commonwealth of Virginia, Department of Environmental Quality, *ex rel.*, State Water Control Board, Robert G. Burnley, Director & Executive Secretary.

M. Scott Hart (James E. Ryan, Jr.; George A. Somerville; Stuart E. Katz, City Attorney; Allen L. Jackson, Chief Deputy City Attorney; Troutman Sanders LLP, on briefs), for appellee City of Newport News.

Newport News requested and received a permit from the State Water Control Board (SWCB) to go forward with the proposed King William Reservoir, a large-scale water supply project that principally relies on freshwater withdrawals from the Mattaponi River. The Mattaponi Indian Tribe and Alliance to Save the Mattaponi, *et al.* filed separate chancery actions seeking to overturn the permit decision under the Virginia Administrative Process Act (VAPA), Code §§ 2.2-4026, 62.1-44.29. In addition to its VAPA challenge, the Tribe also sought declaratory and injunctive relief alleging a freestanding claim under the 1677 Treaty at Middle Plantation.

After a successful appeal to the Virginia Supreme Court to establish their standing, Mattaponi Indian Tribe v. Commonwealth, 261 Va. 366, 541 S.E.2d 920 (2001), the Tribe and Alliance returned to circuit court to press their claims on the merits. On remand, the circuit court affirmed the SWCB's permit decision under the VAPA and dismissed the non-VAPA treaty claim on the ground that one of the treaty provisions required all treaty disputes to be resolved by the Governor without access to later judicial review.

The Tribe and Alliance again appeal. In response, the Commonwealth moves to dismiss both appeals on sovereign immunity grounds. Rejecting the sovereign immunity defense, we

- 2 -

agree that the SWCB's decision should be affirmed under the VAPA. We express no opinion, however, on the circuit court's dismissal of the Tribe's non-VAPA treaty claim. Because our appellate jurisdiction over this case extends only to the VAPA issues, we transfer the non-VAPA portion of this appeal to the Virginia Supreme Court pursuant to Code § 8.01-677.1.

## I. BACKGROUND

Several localities on Virginia's Lower Peninsula have engaged in nearly three decades of study, administrative proceedings, and litigation to solve what they believe to be an impending water shortage. The proposed King William Reservoir has itself been the subject of litigation in various judicial forums since 1997 and the object of on-going study for almost two decades.

In 1987, three localities (Newport News, Williamsburg, and York County)[1] created the Regional Raw Water Study Group (the Study Group) to address critical water shortages and to respond to the Virginia Department of Health's order to seek out additional water sources.[2] The Study Group retained Malcolm Pirnie, Inc. to prepare a raw water study plan to estimate water needs over a fifty-year period from 1990 through 2040.

Projecting a 35 million gallon per day (mgd) deficit by the year 2040, Malcolm Pirnie, Inc. published an initial report evaluating thirty-one options to provide the region with additional raw water supplies. Of those alternatives, ten involved long-term options with safe yields of raw water

---

[1] James City County attended the Study Group's organizational meeting in 1988, but did not join the Study Group until 1990.

[2] Local jurisdictions included in the study area included the cities of Newport News, Hampton, Poquoson and Williamsburg and the counties of York and James City. The study area also included several federal facilities including Fort Monroe, Langley AFB, NASA Langley Research Center, Fort Eustis, Yorktown Naval Weapons Station, Camp Peary, Cheatham Annex, and Yorktown Coast Guard Reserve Training Center. Finally, the study area includes at least two state-recognized Indian Reservations, the Mattaponi Indian Reservation and the Pamunkey Indian Reservation.

exceeding 20 mgd.  Of those ten, five were later deemed to be "not permittable" based on comments or past action by various state and federal agencies.[3]

Of the five remaining long-term options, the Study Group found Lake Gaston to be impracticable based on Virginia Beach's already protracted legal battle to obtain water from that source.  A desalinization plant on the York River was also rejected as economically prohibitive. Three remaining alternatives — reservoirs on Black Creek with a pumpover from the Pamunkey River, Ware Creek with a pumpover from the Pamunkey River, and Cohoke Mill Creek (King William Reservoir) with a pumpover from the Mattaponi River — were deemed practical.

Noting host approval issues and problems associated with draining water from the already taxed Pamunkey River, the Study Group turned its focus primarily to the King William Reservoir alternative in conjunction with other short-term projects.  In 1993, Newport News, as the lead municipality for the Study Group, applied for a state permit under the State Water Control Law, Code § 62.1-44.2 *et seq.* and a federal permit under the Clean Water Act, 33 U.S.C. § 1251 *et seq*. After conducting public hearings, receiving written recommendations from state and federal agencies, reviewing draft and final environmental impact statements, and reviewing public comments, including comments submitted by the Tribe and Alliance, the SWCB in 1997 issued a Virginia Water Protection Permit to Newport News pursuant to Code § 62.1-44.15:5.

During the administrative process, the Tribe argued that the SWCB should interpret and enforce provisions of the 1677 Treaty at Middle Plantation.  Entered into shortly after Bacon's Rebellion, the treaty between the "Dread Sovereign" King Charles II and the "Kings and Queens" of several Indian tribes sought to establish "a good Peace with the Neighbour Indians" and the

---

[3] These alternatives included Lake Genito (not permittable per USFWS, USEPA, USACOE), Lake Anna (not permittable per USFWS, USEPA), James River between Richmond and Hopewell (not permittable per VDH), groundwater desalinization as long term option (not permittable per SWCB, USFWS), and James River Desalinization (not permittable per VDH).

English settlers. One provision of the 1677 treaty states that "no English shall Seat or Plant nearer than Three miles of any Indian Town; and whosoever hath made, or shall make any Incroachment upon their Lands, shall be removed from thence . . . ." Another provision allows "Indians" to hunt, fish, and gather vegetation not "useful to English" on English land provided they obtain a "certificate" from a magistrate. Finally, Article XVIII of the treaty includes what appears to be a form of dispute resolution provision:

> That upon any Discord or Breach of Peace happening to arise between any of the Indians in Amity with the English, upon the first appearance and beginning thereof, and before they enter into any open Acts of Hostility or War one against another, they shall repair to His Majesties Governour, by whose Justice and Wisdom it is concluded such Difference shall be made up and decided, and to whose final Determination the said Indians shall submit and conform themselves.

The Tribe first presented its treaty claim to the Virginia Attorney General seeking a response on behalf of the Commonwealth as successor to King Charles II. In reply, the Attorney General opined that the relevant portions of the treaty had been abrogated by implication. The three-mile area around the Mattaponi reservation, the Attorney General observed, had been developed over many years with more than 150 structures "including numerous homes and dependent buildings, several churches, a school, and the King and Queen County courthouse." There were also "some thirteen public highways, ten millponds, several boat landings, many fields under cultivation, cemeteries, a gravel pit, and a landfill situated within the buffer." Determining that the 1677 treaty established the three-mile zone as a buffer to prevent violence between the "English" and the "Indians" and that the provision had been impliedly abrogated by large-scale, non-tribal ownership, the Attorney General concluded that the Tribe had no enforceable legal rights arising out of the treaty that would preclude the proposed water project.

Though aware of the Attorney General's position, the SWCB refused to adjudicate the treaty dispute in the permit action or to enforce any justiciable rights of action allegedly arising out of the treaty. The SWCB, however, did consider evidence of the Tribe's traditions and cultural interests (such as traditional fishing, gathering, religious practices, and archeological sites) and took them into account as decisional factors. The SWCB also considered Alliance's challenge to the project's impact on wetlands, the effect on salinity levels in the Mattaponi River, and the allegedly overstated need for drinking water supply. Finding the evidentiary record sufficiently complete to make a prudent decision, the SWCB issued the permit and attached various conditions to ensure its continuing authority to mitigate any unforeseen environmental harms.

Both the Tribe and Alliance filed separate actions in the Newport News Circuit Court to challenge the SWCB's decision to issue the permit. Alliance limited its suit to an administrative appeal of the SWCB's decision under the VAPA. The Tribe filed a VAPA appeal, but also sought declaratory and injunctive relief asserting separate, non-VAPA claims under the 1677 Treaty, Title VI of the Civil Rights Act of 1964, and the Indian Nonintercourse Acts of 1790 and 1834.

The circuit court dismissed both suits, holding that the Tribe and Alliance lacked standing under the VAPA to challenge the SWCB's decision. The circuit court also held that the non-VAPA claims were "multifarious and improperly pled" in a VAPA proceeding. On appeal to us, the Tribe and Alliance challenged both rulings of the circuit court. We affirmed the circuit court's decision on standing under the VAPA. Mattaponi Indian Tribe v. Commonwealth, 31 Va. App. 472, 524 S.E.2d 167 (2000); Alliance to Save the Mattaponi v. Commonwealth, 30 Va. App. 690, 519 S.E.2d 413 (1999). Because our decision on standing disposed of the cases, we offered no advisory opinion on the circuit court's multifariousness holding. See Mattaponi Indian Tribe, 31 Va. App. at 479 n.3, 524 S.E.2d at 171 n.3.

The Tribe and Alliance appealed to the Virginia Supreme Court, challenging the circuit court's standing decision (which we affirmed) but not its multifariousness holding (which we did not address). The Supreme Court consolidated the appeals, reversed our standing decision, and ordered the cases "remanded to the circuit court for trial upon the merits of the protesters' claims." Mattaponi Indian Tribe, 261 Va. at 378, 541 S.E.2d at 926.

On remand, the Tribe moved for leave to file a "First Amended Petition for Appeal" on the ground that "some of the claims it originally raised should be narrowed and clarified." The Amended Petition deleted the claim under the Indian Nonintercourse Acts of 1790 and 1834, but retained the remaining two non-VAPA claims. The Tribe's Amended Petition asserted four separate counts.

The first alleged that the 1677 Treaty authorized a "bill in equity" to protect the Tribe's right of exclusion from the three-mile anti-encroachment zone. See Amended Petition ¶ 35. The circuit court had authority to adjudicate this claim, the Tribe asserted, under the "general jurisdiction" of a trial court. Id. ¶ 21. Joining Newport News as a party along with the Commonwealth respondents, the Tribe requested declaratory and injunctive relief to void the permit and to enjoin the Commonwealth "from further violations" of the treaty. Id. ¶ 6 (prayer for relief).

The second challenged the SWCB permit as violative of the State Water Control Law. Contending the SWCB failed to protect the Tribe's treaty rights, cultural interests, and use of state waters, the Tribe asserted that the administrative permit decision should be overturned by the circuit court under the VAPA.

The third also sought VAPA review, contending that the permit decision violated administrative regulations issued under the State Water Control Law, 9 Va. Admin. Code §§ 25-210-80(A), 25-210-120(A).

The fourth asserted a non-VAPA claim under Title VI of the Civil Rights Act of 1964, alleging that the SWCB discriminated against the "Tribe's needs and values" by overlooking the project's "devastating cost to tribal culture and resources, and the future survival of the Tribe itself." See Amended Petition ¶¶ 73, 76.

The Tribe also sought an award of prevailing party attorney's fees under Code § 2.2-4030 for its VAPA appeal and under 42 U.S.C. § 1988 for its non-VAPA claims under the treaty and Title VI of the Civil Rights Act of 1964. Id. ¶ 7 (prayer for relief).

The Commonwealth and Newport News objected to the motion for leave to amend, relying on their earlier successful assertion that principles of multifariousness forbid the joinder of VAPA and non-VAPA claims in a single chancery action. Though no appellate court had addressed the issue of multifariousness, the circuit court reversed its earlier position, overruled the objection to joinder, and granted the Tribe leave to amend.

After ruling on the multifariousness issue, the circuit court entered a pretrial scheduling order. Because VAPA appeals in circuit court must proceed entirely on the administrative record, see Code § 2.2-4027, the court ordered the SWCB to file the record and all parties to submit briefs. The VAPA appeals, the order provided, "shall be resolved upon cross motion for summary judgment based on the administrative record." The scheduling order also set a trial date for all "issues not arising under the VAPA" and established pretrial cutoffs for discovery, expert disclosures, exhibit and witness lists, motions *in limine*, witness subpoenas, and the like.

Throughout the circuit court proceedings, the judge and the litigants understood that the case rested on two separate jurisdictional grounds: the VAPA grant of appellate jurisdiction in the circuit

court to review the SWCB's permit decision, and the circuit court's general chancery jurisdiction to adjudicate the Tribe's assertion of non-VAPA treaty and statutory rights of action.[4]

Prior to trial, the Commonwealth and Newport News filed demurrers and summary judgment motions seeking dismissal of all claims asserted by the Tribe and Alliance. The Tribe and Alliance asserted cross-motions for summary judgment. In response, the circuit court dismissed both cases. The court rejected the Tribe's non-VAPA claim seeking declaratory and injunctive relief based upon the 1677 treaty on the ground that Article XVIII required all treaty disputes to be submitted to the Governor for final and binding resolution. No further judicial review, the court held, could be obtained. Rejecting the Tribe's argument that federal law

---

[4] See, e.g., Tribe's Memorandum in Opposition to Motion to Strike, at 6 (Jun. 17, 2002) (noting that the "[t]reaty claims are free standing"); id. at 9 (arguing that the treaty and Title VI claims are not restricted to VAPA); Circuit Court Order (Jul. 9, 2002) (overruling objection based on multifariousness); Circuit Court Scheduling Order (Jan. 21, 2003) ("This case involves both an appeal from a case decision by an administrative agency pursuant to the [VAPA] . . . and a suit in equity to enforce a treaty . . . ."); Letter from Newport News Counsel to Court (Nov. 26, 2002) ("This letter, as you requested, confirms that the parties, by agreement, have continued the trial on the non-VAPA issues . . . ."); Letter from Newport News Counsel to Court (Dec. 4, 2002) (confirming that "we have set the trial of the non-VAPA issues"); Tribe's Memorandum in Opposition to Motion in Limine, at 3 (Dec. 18, 2002) (arguing that the Tribe is offering expert testimony only in support of the "separate Treaty claim in this matter" and that VAPA's judicial review provisions do not apply to "issues separately subject to de novo review, such as the Tribe's Treaty violation claim"); Tribe's Memorandum in Opposition to Demurrers & Motions for Summary Judgment, at 1 (Dec. 18, 2002) ("The Tribe's First Assigned Error alleges violations of the Treaty at Middle Plantation, for which the Tribe has a common law cause of action that this Court may hear as a court of general jurisdiction."); id. at 6 (contending that the Tribe has a freestanding, justiciable treaty claim); id. at 8 (contending that the Treaty is actionable under both federal and state common law); Appellees' Response in Support of Demurrers and Motions for Summary Judgment, at 33, 34 (Jan. 15, 2003) (arguing that the Tribe has no common law right to enforce the treaty but, alternatively, the Tribe's non-VAPA treaty claims are barred by sovereign immunity); Appellees' Supplemental Memorandum (Feb. 19, 2003) (responding to court's question by stating that, properly construed, the treaty would have granted the tribe no recourse for judicial review of governor's decision in the colonial era); Tribe's Reply Letter (Feb. 25, 2003) (arguing the court can "hear the Tribe's federal common law claims based on aboriginal title because state courts are courts of general jurisdiction" and the treaty, itself, "contains an implied right of action"); Final Order of Circuit Court (Aug. 26, 2003) (finding that all claims arising out of the treaty "arise under Virginia law," not federal law, and holding that the court has no "jurisdiction to review gubernatorial decisions").

governed, the circuit court applied Virginia law and concluded it did "not have jurisdiction to review gubernatorial decisions concerning the 1677 Treaty at Middle Plantation." The court also dismissed the remaining non-VAPA claim arising out of Title VI of the Civil Rights Act.

Reviewing the SWCB's decision under the VAPA, the circuit court held that the SWCB complied with the governing legal standards for issuing the permit and rested its decision on a showing of substantial evidence. The circuit court's final decrees ordered both cases "stricken from the Court's docket and placed among the ended causes."

The Tribe and Alliance filed separate appeals to us. Both continue to challenge the SWCB's permit decision under the VAPA. The Tribe also appeals the dismissal of its freestanding treaty claim, but has abandoned its claims under the State Water Control Law regulations (Count 3) and Title VI of the Civil Rights Act of 1964 (Count 4). We consolidated these appeals for oral argument and decision, finding the arguments interrelated and substantially similar.

## II. COMMONWEALTH'S SOVEREIGN IMMUNITY

While the cases were on appeal to us, the Commonwealth filed a motion to dismiss both appeals on sovereign immunity grounds. Conceding that it had not raised this particular argument in the circuit court or the earlier appeals of these cases (despite having raised a very similar sovereign immunity objection which we previously rejected),[5] the Commonwealth contends the issue cannot be waived because it implicates subject-matter jurisdiction. We address this issue first to determine whether we have authority to resolve the merits of the appeal.

---

[5] Alliance to Save the Mattaponi, 30 Va. App. at 697-702, 519 S.E.2d at 415-18.

The Commonwealth acknowledges that Code § 62.1-44.29 expressly waives sovereign immunity for purposes of providing judicial review of SWCB decisions to issue or deny permits under Code § 62.1-44.15:5. See Mattaponi Indian Tribe, 261 Va. at 374 n.*, 541 S.E.2d at 923 n.*. Even so, the Commonwealth argues, that same statute also requires that such review be performed "in accordance with the provisions of the Administrative Process Act (§ 2.2-4000 et seq.)." And among the various exemptions in the VAPA is Code § 2.2-4002(B)(3). It provides:

> Agency action relating to the following subjects shall be exempted from the provisions of this chapter:
>
>     *     *     *     *     *     *     *
>
> The location, design, specifications or construction of public buildings or other facilities.

Because the proposed reservoir "undeniably is a public facility," the Commonwealth argues, the exemption precludes any judicial review of the SWCB's decision to issue a permit authorizing its construction. Given the absence of any other statutory provision authorizing judicial review, the Commonwealth contends its sovereign immunity remains intact.

The Commonwealth's argument misses entirely the point of the exemption, the Tribe and Alliance respond. As they see it, the exemption merely carves out of the VAPA any appellate review of contract disputes arising out of state construction projects and thereby preserves the unique statutory remedies governing bid protests and state construction contract disputes. See Virginia Public Procurement Act, Code §§ 2.2-4357 to 2.2-4366; see, e.g., Allstar Towing, Inc. v. City of Alexandria, 231 Va. 421, 423-24, 344 S.E.2d 903, 905 (1986). Under this view, the exemption applies to first-party situations (like a state agency contracting for the construction of an office building), but not to third-party situations (like a state agency issuing a permit authorizing others to build their own office buildings).

Both sides of this debate claim their competing interpretations capture the plain meaning of the statutory words and that any other interpretation does violence to the literal text of the statute — an understandable standoff given the "textualist approach" to statutory interpretation uniformly embraced by Virginia courts. See Cent. Va. Obstetrics & Gynecology Assocs. v. Whitfield, 42 Va. App. 264, 276, 590 S.E.2d 631, 638 (2004). To us, however, the plain meaning of this particular statute is not so plain. Its literal text arguably embraces both opposing interpretations. In cases like this, we look for guidance in the next level of construction: statutory context.

In legal codes, as in ordinary conversation, "a word is known by the company it keeps." Sprietsma v. Mercury Marine, 537 U.S. 51, 63 (2002) (quoting Gustafson v. Alloyd, Co., 513 U.S. 561, 575 (1995)). The same can be said of a statutory phrase. Statutory provisions "which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." Finnerty v. Thorton Hall, Inc., 42 Va. App. 628, 635-36, 593 S.E.2d 568, 572 (2004) (quoting Lucy v. County of Albemarle, 258 Va. 118, 129, 516 S.E.2d 480, 485 (1999)). As a result, we consider "the entire body of legislation and the statutory scheme to determine the 'true intention of each part.'" Id. at 636, 593 S.E.2d at 572 (citation omitted). And "when a controversy involves a number of related statutes," we construe them "together in order to give full meaning, force, and effect to each." Id. (quoting Ainslie v. Inman, 265 Va. 347, 353, 577 S.E.2d 246, 249 (2003)).

Aided by these principles, we find the interpretation advocated by the Tribe and Alliance best advances the legislative intent reflected in these statutes. It makes no sense to us for the legislature to expressly authorize judicial review of SWCB permit decisions under the VAPA in Code § 62.1-44.29, only to find out that the VAPA implicitly exempts them from judicial review under Code § 2.2-4003(B)(3). The Commonwealth argues that, under its interpretation, this

statutory double-reverse can be explained by the observation that the VAPA exemption would still allow judicial review of SWCB permits for *private* facilities.

We find nothing in the statutory framework, however, suggesting the legislature intended such a counterintuitive distinction: authorizing judicial review of minor private projects (like a 10 foot pier on a waterfront residence), while withholding judicial review of major public projects (like a multi-million dollar reservoir). For these reasons, we hold that Code § 62.1-44.29 expressly waives sovereign immunity for judicial review of SWCB permit decisions under the VAPA.[6] The VAPA exemption in Code § 2.2-4003(B)(3) does not apply to SWCB permit decisions because that exemption serves only to preserve the unique judicial review procedures applicable to government bid and contract disputes.[7]

### III. THE APPELLATE STANDARD OF REVIEW

Under the VAPA, "the duty of the court with respect to issues of fact shall be limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Code § 2.2-4027; see Vasaio v. DMV, 42 Va. App. 190, 196, 590 S.E.2d 596, 599 (2004). We have authority to "reject the

---

[6] Prior to the 2000 amendment to Code § 62.1-44.29, we had interpreted that statute to implicitly waive sovereign immunity and to authorize judicial review of permit decisions by the SWCB. Alliance to Save the Mattaponi, 30 Va. App. at 696-701, 519 S.E.2d at 415-18. While our decision was on appeal to the Virginia Supreme Court, the General Assembly erased any doubt about its legislative intent by amending § 62.1-44.29 to expressly provide for such review. See Mattaponi Indian Tribe, 261 Va. at 374 n.1, 541 S.E.2d at 923 n.1 ("As amended in 2000, the statute now contains an express waiver of such immunity from suit against the Board arising from issuance of such a permit, as the result of insertion of '62.1-44.15:5' in the first sentence of § 62.1-44.29."). Unless we dismiss the timing of this amendment as a mere coincidence, the legislative change to Code § 62.1-44.29 confirms our understanding of the interplay between that statute and Code § 2.2-4003(B)(3).

[7] Both our holding and its *ratio decidendi* apply only to VAPA jurisdiction to review the SWCB's permit decision. We express no opinion on the question whether sovereign immunity bars the Tribe's freestanding non-VAPA claims under the 1677 treaty. See *post* at IV.

agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" Va. Imps., Ltd. v. Kirin Brewery of Am., LLC, 41 Va. App. 806, 819, 589 S.E.2d 470, 476 (2003) (quoting Va. Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)) (emphasis in original).

In exercising this review, "we cannot seize upon questions, comments or incidences of an orderly administrative process to discredit agency action that is supported by the record, viewed in context and as a whole." Envtl. Def. Fund v. State Water Control Bd., 15 Va. App. 271, 279, 422 S.E.2d 608, 613 (1992). We focus instead on the decision itself and the entire factual record considered by the agency. Id. By design, this standard gives "great stability and finality to the fact-findings of an administrative agency." Va. Real Estate Comm'n, 226 Va. at 269, 308 S.E.2d at 125 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It also ensures that we remain faithful to our statutory duty to "take due account of the presumption of official regularity" as well as the agency's "experience and specialized competence." Code § 2.2-4027.

Though we defer to an agency's factual determinations, we afford no such deference to its legal interpretations of statutes. See 7-Eleven, Inc. v. Dep't of Envtl. Quality, 42 Va. App. 65, 73, 590 S.E.2d 84, 88 (2003) (*en banc*) ("The reviewing court may set the agency action aside, even if it is supported by substantial evidence, if the court's review discloses that the agency failed to comply with a substantive statutory directive."). We have long held that "pure statutory interpretation is the prerogative of the judiciary," and thus, Virginia courts "do not delegate that task to executive agencies." Finnerty, 42 Va. App. at 634, 635, 593 S.E.2d at 571 (citations omitted). As a result, statutory interpretation "presents a pure question of law subject to *de novo* review" on appeal. Horner v. Dep't. of Mental Health, 268 Va. 187, 192, 597 S.E.2d 202, 204 (2004).

#### IV. THE TRIBE'S CLAIM UNDER THE 1677 TREATY

The Tribe asserted its rights under the 1677 Treaty at Middle Plantation in two distinct ways. The Tribe raised the treaty claim before the SWCB, which refused to adjudicate it but nonetheless considered analogous cultural interests of the Tribe as decisionmaking factors. The Tribe appealed the SWCB's decision to the circuit court under the VAPA. In addition, the Tribe asserted in circuit court a freestanding non-VAPA claim based upon the treaty. The Tribe argued that federal law governed this claim and that it warranted both declaratory and injunctive relief.

We begin by addressing the VAPA appeal. Under the VAPA, the circuit court reviews the agency's action in a manner "equivalent to an appellate court's role in an appeal from a trial court." J. P. v. Carter, 24 Va. App. 707, 721, 485 S.E.2d 162, 169 (1997) (quoting Sch. Bd. v. Nicely, 12 Va. App. 1051, 1061-62, 408 S.E.2d 545, 551 (1991)) (internal quotation marks omitted). "In this sense, the General Assembly has provided that a circuit court acts as an appellate tribunal." Gordon v. Allen, 24 Va. App. 272, 277, 482 S.E.2d 66, 68 (1997) (citation omitted); Pence Holdings, Inc. v. Auto Ctr., Inc., 19 Va. App. 703, 708, 454 S.E.2d 732, 734-35 (1995).

Jurisdiction under the VAPA does not extend to any matter "subject by law to a trial de novo in any court." Code § 2.2-4025(A). Thus, the Tribe's freestanding treaty claim — a matter "subject by law to a trial de novo" — must have some jurisdictional support other than the VAPA. In other words, the circuit court's derivative appellate jurisdiction goes no further than the SWCB's original jurisdiction. If the SWCB had no authority to adjudicate the Tribe's treaty claims in the context of an administrative permit proceeding, neither did the circuit court in the context of VAPA appellate review.

The SWCB is not a court, but an administrative board with a statutorily defined mission. See Carpenter v. Va. Real Estate Bd., 20 Va. App. 100, 106, 455 S.E.2d 287, 289 (1995)

- 15 -

(recognizing that an administrative agency "is a creature of statute and derives its power only from its authorizing legislation"). Its members are not administrative law judges, but citizens without any required legal training. See Code § 62.1-44.9. When deciding to issue or deny a water protection permit, the SWCB may conduct a "public meeting or hearing" or dispense with either. See Code § 62.1-44.15:5(D). The proceeding more resembles an "informal fact finding" under Code § 2.2-4019 than anything akin to a trial.

The SWCB had authority only to issue or to deny the permit.[8] The SWCB's decision does not and, by law, cannot affect private rights of action between competing litigants. See Code § 62.1-44.22; 9 Va. Admin. Code § 25-210-70(B); cf. Zappulla v. Crown, 239 Va. 566, 571, 391 S.E.2d 65, 68 (1990) (finding that issuance of Virginia Marine Resources permit "does not amount to an adjudication of conflicting private property claims"). It follows that the SWCB had no power to adjudicate the Tribe's assertion of legal rights of action arising out of the 1677 treaty. Neither did the circuit court in its capacity as an appellate tribunal.

This conclusion, however, does not end the analysis. Relying on the circuit court's "general jurisdiction," the Tribe also asserted a freestanding, non-VAPA treaty claim based on federal law. The remedy sought was declaratory and injunctive relief. Federal rights of action, the Tribe pointed out, can properly be asserted in state court under the doctrine of concurrent jurisdiction. See generally Nevada v. Hicks, 533 U.S. 353, 366 (2001) (recognizing that under our "system of dual sovereignty" state courts have jurisdiction to adjudicate federal claims);

_____

[8] Under 33 U.S.C. § 1341(a)(1), an "applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the . . . agency a certification for the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions" of the CWA. See, e.g., Int'l Paper Co. v. Ouellette, 479 U.S. 481, 490 (1987) (observing that federal agency must "obtain certification from the source State that the proposed discharge complies with the State's technology-based standards and water-quality-based standards"). The SWCB permit serves as a § 401 CWA certification. See Code § 62.1-44.15:5(A).

- 16 -

Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667 (1974) (recognizing a federal common law action for claims of "Indian title" or "aboriginal title").

The circuit court exercised its general jurisdiction by refusing to dismiss the non-VAPA claims as multifarious and by scheduling an evidentiary trial on the merits to decide them. In its final judgment, the court rejected the Tribe's assertion that federal law governed the treaty and interpreted Article XVIII to vest exclusive power in the Governor to resolve all disputes arising out of the treaty. In essence, the court treated this provision as a kind of 17th century forum-selection clause — one so exclusive as to preclude any further judicial review. Cf. County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 249, nn.23 & 24 (1985). In making this decision, however, the circuit court was not saying it had no subject matter jurisdiction to adjudicate the treaty claim. The court's decision necessarily implied an *actual adjudication*, for it expressly ruled on the applicable choice of law, interpreted a disputed provision of the treaty, and then dismissed the Tribe's claim on this basis.

Given the segmentation of our appellate authority, however, we cannot resolve the Tribe's challenge to the circuit court's dismissal of the non-VAPA, freestanding treaty claim. By statute, our jurisdiction extends only to specific subject matters. See Code § 17.1-405. It includes jurisdiction over a "final decision of a circuit court on appeal from . . . a decision of an administrative agency" and some types of interlocutory orders within such a case. Code § 17.1-405(1) & (4); see also Code § 62.1-44.30. But it does not include appellate jurisdiction over chancery suits generally or any other type of civil suit outside the boundaries of Code § 17.1-405. Nor has any Virginia case recognized any form of ancillary jurisdiction beyond these statutory limits. As a result, the Virginia Supreme Court alone has appellate jurisdiction to

review the Tribe's non-VAPA, freestanding claim under the 1677 treaty. We thus transfer this portion of the Tribe's appeal to the Virginia Supreme Court pursuant to Code § 8.01-677.1.[9]

## V. THE VAPA APPEALS OF THE SWCB'S DECISION

Within the context of our VAPA jurisdiction, both the Tribe and Alliance contend that the SWCB both misunderstood and misapplied the statutory standard governing its permitting discretion. Like the circuit court, we find no fault in the SWCB's understanding of the governing legal standard or its application of it to this case.

The 1997 version of the State Water Control Law authorized the SWCB to issue a permit if it determined that "the proposed project 'is consistent with the provisions of the [federal Act] and will protect instream beneficial uses.'" Mattaponi Indian Tribe, 261 Va. at 377, 541 S.E.2d at 925-26 (quoting Code § 62.1-44.15:5(B)). "Instream beneficial uses include, but are not limited to, the protection of fish and wildlife habitat, maintenance of waste assimilation, recreation, navigation, and cultural and aesthetic values." Code § 62.1-10(b).[10] The statute also requires the SWCB, before issuing a permit, to consult with other state agencies to determine "the need for balancing instream uses with offstream uses." Code § 62.1-44.15:5(F). In this

---

[9] Code § 8.01-677.1 authorizes the transfer of an entire appeal or a discrete "portion of the appeal" outside our appellate jurisdiction. See, e.g., Davis v. Commonwealth, 35 Va. App. 533, 544 n.1, 546 S.E.2d 252, 253 n.1 (2001); Giles v. Commonwealth, 32 Va. App. 519, 525 n.1, 529 S.E.2d 327, 328 n.1 (2000); Thomas v. Commonwealth, 24 Va. App. 49, 56, 480 S.E.2d 135, 138 (1997) (*en banc*); Claxton v. City of Lynchburg, 15 Va. App. 152, 156 n.1, 421 S.E.2d 891, 892 n.1 (1992).

[10] This definition of instream beneficial uses appears in chapter 2 of Title 62.1, entitled "State Policy As To Waters." This restatement of the Commonwealth's overarching water policy should be taken into account when interpreting the State Water Control Law in chapter 3.1 of that same Title. As noted earlier, statutory provisions "which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." Finnerty, 42 Va. App. at 635-36, 593 S.E.2d at 572 (citation omitted).

balancing, "[d]omestic and other existing beneficial uses shall be considered the highest priority uses." Code § 62.1-44.15:5(C).

Because the SWCB must also act consistently with its enabling legislation, we also look to those statutory provisions to discern the overarching policy judgments made by the legislature. Code § 62.1-44.36 authorizes the SWCB to formulate water resources policy and lists several specific legislative directives. One of these directives speaks to the issue of conflicting water uses:

> Adequate and safe supplies should be preserved and protected for human consumption, while conserving maximum supplies for other beneficial uses. When proposed uses of water are in mutually exclusive conflict or when available supplies of water are insufficient for all who desire to use them, preference shall be given to human consumption purposes over all other uses[.]

Code § 62.1-44.36(2). Also relevant to understanding the General Assembly's intent is the "State Policy As To Waters" which defines "beneficial use" and further states: "Public water supply uses for human consumption shall be considered the highest priority." Code § 62.1-10(b); cf. Code § 62.1-11(C).

These statutory policy directives parallel the traditional view of the courts. "Drinking and other domestic purposes are the highest uses of water. An ample supply of wholesome water is essential." Connecticut v. Massachusetts, 282 U.S. 660, 673 (1931). "A city has the right and the duty to protect its water supply and '[i]t is settled policy of the State and of all States to encourage any reasonable exercise of this right and power.'" Tidewater Ass'n of Homebuilders, Inc. v. Virginia Beach, 241 Va. 114, 118, 400 S.E.2d 523, 525 (1991) (quoting Bd. of Supervisors v. Norfolk, 153 Va. 768, 775, 151 S.E. 143, 145 (1930)).

The Tribe and Alliance find none of these provisions particularly helpful, on the ground that balancing *present* uses with *proposed* uses necessarily implies that the former will have to

- 19 -

suffer to some extent to accommodate the latter. That result could not possibly be contemplated, the Tribe contends, because Code § 62.1-44.15:5(B)'s directive to "protect" existing instream beneficial uses renders intolerable any negative impacts on them.

But if that were true, permits would almost never be issued. These permits, after all, specifically authorize the alteration of "the physical, chemical or biological properties of state waters" and, when requested, "excavation in a wetland." Code § 62.1-44.15(5)(b) & (c); see also Code § 62.1-44.15:5(D)(i-iv). To some extent, some measurable negative impact on existing beneficial uses will likely occur in every case where a permit is sought to create a future beneficial use. This strikes us as a matter of common sense, hardly something we should deconstruct with the tools of statutory construction.

We thus reject the absolutist no-harm interpretation of the statutory mandate to "protect" instream beneficial uses. In the context of the State Water Control Law, the mandate requires the SWCB to exercise prudence and good judgment in balancing existing and proposed beneficial uses and to minimize, where reasonable, conflict between the two. Existing instream beneficial uses must be protected, to be sure, but the scope of that protection and the risk tolerance that necessarily accompanies it are matters within the SWCB's specialized competency. If exercised reasonably, the SWCB's discretion should not be undermined by the courts.

Satisfied that the SWCB correctly understood the legal standard for issuing the permit, we next turn to the question whether substantial evidence supports the SWCB's decision. The Tribe and Alliance challenge the permit on several factual fronts. The Tribe argues that the SWCB failed to protect the Tribe's "cultural values in its traditional fishing, gathering, and religious practices" and likewise failed to protect tribal archeological sites. Alliance focuses instead on the project's impact on wetlands, the effect on salinity levels in the Mattaponi River, and the allegedly overstated need for drinking water supply.

- 20 -

Under the VAPA, in determining "whether substantial evidence in the record supports the decisions of the [agency] and trial court, we review the evidence and reasonable inferences it raises in the light most favorable to the prevailing party below." Groome Transp., Inc. v. Va. DMV, 27 Va. App. 682, 693, 500 S.E.2d 852, 857 (1998). "The burden of proof rests upon the party challenging an agency decision to show that the record lacks substantial evidence to support the decision." Consolidation Coal Co. v. DMME, 33 Va. App. 784, 788, 537 S.E.2d 15, 17 (2000); see also Smith v. Dep't. of Mines, Minerals & Energy, 28 Va. App. 677, 685, 508 S.E.2d 342, 346 (1998); Code § 2.2-4027 (providing that the "burden shall be upon the party complaining of agency action"). Applying these principles, we find that the Tribe and Alliance cannot demonstrate the SWCB's decision to be factually insupportable or in any way arbitrary and capricious.

(a) *The Tribe's Cultural Interests As Instream Beneficial Uses*

The Tribe has a rich history of shad fishing in the Mattaponi River. The Tribe describes this tradition as a core aspect of its unique identity as a people, providing a sacred link with tribal ancestors and cultural origins. Despite the significance of this issue, however, the Tribe points us to no specific evidence in the administrative record demonstrating that the project would in fact harm this tradition.

Summarizing the evidence for the SWCB, the Department of Environmental Quality (DEQ) reported that the project would not in any way restrict the Tribe's fishing practices. The SWCB accepted this view, but nonetheless imposed permit conditions restricting water withdrawals during shad spawning periods, requiring the placement of the water intake structures away from fish beds, and mandating the use of screens to impede the flow of fish into the pipes. The DEQ also advised the SWCB that the intricate conditions limiting the frequency, amount,

and times of the withdrawals would protect against any harmful changes in salinity levels, a matter we address in more detail later. *Post* at V(c).

The Tribe also argued that for centuries it has gathered "plants and herbs in and along the river and creek for both food and traditional medicines." Here again, however, the Tribe offered no specific evidence showing how the project would detrimentally alter these practices. The only mention of gathering practices appears to be a brief reference in a letter to the Army Corps. Yet nothing in this proffer demonstrated when and where these gathering practices take place or exactly how these practices would suffer. Similarly, the Tribe described its religious ceremonies on the banks of the Mattaponi River and expressed its reverence for the river as a divine gift of life. But the administrative record reveals little, if any, evidence of exactly how the project would interfere with the conduct of the Tribe's sacred rituals or religious ceremonies.

Both before the SWCB and on appeal, the Tribe relies on generalizations lacking any specific factual foundation. Considerably more is required for the courts to overturn the considered judgment of an administrative agency. Cf. Vermont Yankee Nuclear Power Corp. v. Natural Ress. Def. Council, 435 U.S. 519, 553 (1978) (recognizing that a protestor's comments "must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern" because the complaint "cannot merely state that a particular mistake was made" but also must state "why the mistake was of possible significance in the results" (citations omitted)). While the Tribe's concerns cross the threshold of materiality, they fall far short of demonstrating that "the record lacks substantial evidence to support the decision." Consolidation Coal Co., 33 Va. App. at 788, 537 S.E.2d at 17. Given the record before us, therefore, we cannot say the SWCB neglected to consider the Tribe's cultural interests or failed to protect any such specific "instream beneficial uses" shown to exist.

(b) *Archeological Sites Within The Proposed Reservoir Area*

During the planning stages of the project, surveyors discovered for the first time various Indian archeological sites on private, non-tribal property within the general area of the proposed reservoir. In response, Newport News scaled back the size of the reservoir to limit the number of sites affected. For those sites that would be inundated by the reservoir, Newport News proposed a mitigation plan that would excavate each site and preserve any archeologically significant artifacts. The Tribe found this mitigation plan unsatisfactory.

The SWCB concluded that it had no authority to make judgments on the historical or cultural value of these sites because they could not be considered "instream beneficial uses" of the state's waterways under Code § 62.1-44.15:5(B). Other laws and other agencies, the SWCB observed, are assigned the task of resolving this dispute. We agree. The National Historic Preservation Act, 16 U.S.C. § 470f, requires the Army Corps to consider the impact of any project seeking a CWA permit on sites eligible for inclusion in the National Register. Code § 10.1-2200 *et seq.* gives the Virginia Department of Historic Resources a similar voice in the federal permitting process. Both agencies have engaged the issue as part of the CWA permit process, of which the state water permit is but a part.

In contrast, the SWCB's decisionmaking focus is on the *use* of state waters. See Code § 62.1-44.15. The archeological sites cannot be fairly characterized as a use of any river, stream, or brook. That is, the sites are not in any real sense of the word *using* state waters. As the DEQ correctly advised the SWCB:

> The decision to issue a permit does not indicate compliance with Section 106 of the Historic Resources Preservation Act and is not relevant to the preservation, cataloging and recovery of prehistoric Indian artifacts. This is the responsibility of the State Department of Historic Resources and the Army Corps of Engineers.

It may very well be that the impact of the project on these archeological sites causes the project to fall short of obtaining a CWA permit. But that decision belongs to agencies other than the SWCB and, if challenged in litigation, will be scrutinized in judicial proceedings other than the present one.

(c) *Detrimental Salinity Changes In The Mattaponi River*

The Tribe and Alliance challenge the SWCB's conclusion that the project's freshwater withdrawals will not threaten fish or plant life by raising the salinity level of the Mattaponi River. We find substantial evidence in the administrative record supporting the SWCB's decision on this issue.

Studies relied upon by the SWCB concluded that "[n]atural Mattaponi River salinity fluctuations greatly exceed any salinity changes that are predicted due to the proposed withdrawals." Modeling performed by the Virginia Institute of Marine Science (VIMS) bolstered this finding. The proposed freshwater withdrawals, VIMS opined, "would not affect the upstream limits of detectable salinity intrusion." Though tests of the areas downstream from the intake valves indicated that the withdrawals would "cause small increases in the frequency of given levels of salinity intrusion," VIMS found that these areas "already are periodically exposed to comparable salinity levels."[11]

VIMS also examined whether the estimated salinity changes would harm plant life in the Mattaponi River. Focusing on three unique transects of the river, VIMS concluded that the "salinity increased minimally at each transect when compared with the historical salinity record

---

[11] Another study looked at the impact of the salinity changes on anadromous fish species such as the American shad, hickory shad, alewife, and blueback herring, all indigenous to the Mattaponi River. This study found no direct risk to adult fish, but potential risk to fish larvae and eggs that were not as resilient to salinity changes. Conditions limiting the time, amount, and methods of freshwater withdrawals, the study observed, would dissipate this risk.

over the same period" and determined that "little or no impact to wetland plant distributions are anticipated as a result of salinity change caused by proposed freshwater withdrawal levels." VIMS also found that the projected miniscule salinity increases would pose no measurable impact to the sensitive joint vetch, a threatened plant under the Endangered Species Act.

During the permit application process, the Tribe and Alliance criticized VIMS for using a one-dimensional simulation method instead of multi-dimensional modeling that considers a host of additional factors. In response to this criticism, DEQ consulted the Waterways Experiment Station (WES) of the Army Corps. WES found that the VIMS modeling approach provided reliable data, but that an additional "cumulative effects" scenario should be utilized to account for the combined projected withdrawals from the Pamunkey River in addition to the Mattaponi. DEQ accepted this recommendation and retained Malcolm Pirnie, Inc. to perform an additional cumulative analysis. The results from this supplemental study confirmed that any changes to salinity levels would be minimal and would be overwhelmed by the range of salinity concentrations occurring naturally.[12]

The SWCB accepted the findings from the one-dimensional VIMS model and the supplemental cumulative analysis. As a condition to issuing the permit, however, the SWCB required Newport News to develop a salinity monitoring plan using "multidimensional hydrodynamic salinity modeling to analyze short term and vertical variations in salinity in the Mattaponi River with the permitted intake in operation." Once the reservoir becomes

---

[12] On this issue, we concur with the many courts that have "held consistently that the rule of reason guides every aspect" of an agency's approach "including its choice of scientific method." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 200-01 (D.C. Cir. 1991); see also Valley Citizens for a Safe Environment v. Aldridge, 886 F.2d 458, 469 (1st Cir. 1989) (noting "the law makes clear that the agency has discretion 'to determine proper testing methods'" (citations omitted)); Webb v. Gorsuch, 699 F.2d 157, 160 (4th Cir. 1983) ("When there is conflicting expert opinion, it is for the administrative agency and not the courts to resolve the conflict.").

operational, salinity fluctuations outside the original estimates must be reported within one week and could result in additional permit restrictions, including modification or termination of the permit. The SWCB also imposed a comprehensive series of permit conditions restricting the volume, rate, times, and manner of freshwater withdrawals.

The Tribe and Alliance find fault with nearly every aspect of the SWCB's treatment of this issue and highlight evidence in the administrative record purporting to contest the agency's findings. We acknowledge these criticisms but, as an appellate court, find them insufficient to upend the SWCB's decision. The question we must answer is not whether an agency *could* reach a different conclusion on this record, but whether "a reasonable mind would *necessarily* come to a different conclusion." Virginia Imps., Ltd. 41 Va. App. at 819, 589 S.E.2d at 476 (quoting Va. Real Estate Comm'n, 226 Va. at 269, 308 S.E.2d at 125 (emphasis in original)). Put another way, the issue is not whether sufficient evidence supports the Tribe's and Alliance's factual critique, but whether sufficient evidence supports the SWCB's decision. We find that the administrative record supports the SWCB's decision on this issue, and thus, we reject the assertion that the SWCB failed to protect instream beneficial uses by ignoring the impact of the project on salinity levels.

(d) *The Project's Impact On Wetlands*

To create the reservoir, the project proposes to dam up Cohoke Mill Creek and flood about 437 acres of wetlands in the creek basin. To address this issue, the SWCB issued the permit subject to the condition that Newport News "mitigate for the loss of 437 acres of nontidal vegetated wetlands and open water habitat by the successful creation or restoration of vegetated wetlands at a 2:1 level of compensation." See Code § 62.1-44.15:5(D) ("Permits shall contain requirements for compensating impacts on wetlands."). The permit also requires the final mitigation plan to be reviewed and approved, after public hearings, by the DEQ. The final plan

must "establish success criteria by which the successful restoration or creation of wetlands shall be evaluated," including "specific targets with regard to plant coverage, types of plants, density and survival of planned woody species." The plan must also include a monitoring component to ensure its compliance with the SWCB's expectations.

Alliance raises two objections to this aspect of the SWCB's decision. First, Alliance asserts that the SWCB should have postponed its decision until the issuance of a final habitat evaluation study (HEP study) by the U.S. Fish and Wildlife Service. Second, Alliance contends the wetland mitigation conditions imposed by the SWCB are unsatisfactory because the conditions do not adequately avoid and minimize impacts to wetlands. For these reasons, Alliance argues that the SWCB's decision to issue the permit was both "premature and unlawful." We find substantial evidence supporting the SWCB's decision on both issues.

On the prematurity issue, Alliance argues that "federal resource agencies" have voiced their disagreement with the proposed mitigation plan and have insisted that the HEP study should be completed first. One of these federal agencies, Alliance contends, has made clear that a state permit "should not be granted until the applicant's completed mitigation plan can be reviewed by the involved [federal] agencies . . . ." This argument carries little weight with us. It is the decision of the SWCB, not the federal resource agencies, that we must review on appeal. The state water permit is one of the many preconditions to obtaining the CWA permit. If we were to adopt Alliance's approach and reverse this sequence, there would be no end to the process.

Narrowly focused, the issue is this: Does the administrative record provide substantial evidence supporting the SWCB's decision to issue the permit when it did — rather than postpone the decision until the federal resource agencies offered their views or until additional studies were completed? Other than repeating the federal agencies' objections to the initial wetlands mitigation proposal, Alliance does not point to specific evidence demonstrating the factual

insubstantiality of the SWCB's decision on this issue. Without such a showing, we cannot characterize the SWCB's refusal to postpone the decision as arbitrary and capricious as a matter of law.[13] Whether we think it imprudently premature or unnecessarily delayed, the timing of the SWCB's decision is itself a judgment call — one within the sound discretion, as well as the specialized competence, of the SWCB. As the Court of Appeals for the D.C. Circuit explained in an analogous context:

> One of the costs that must be weighed by decisionmakers is the cost of uncertainty — *i.e.*, the costs of proceeding without more and better information. Where that cost has been considered, and where the responsible decisionmaker has decided that it is outweighed by the benefits of proceeding with the project without further delay, the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought.

Alaska v. Andrus, 580 F.2d 465, 473-74 (D.C. Cir. 1978) (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976)).[14]

---

[13] Even in the federal CWA review process, the Army Corps "is not bound to agree with the conclusions reached by these resource agencies, but simply required to listen to and consider their views in the decisionmaking process." Sierra Club v. U.S. Army Corps of Eng'rs, 772 F.2d 1043, 1054 (2d Cir. 1985); see also Citizens Against Burlington, Inc, 938 F.2d at 201 (noting that "under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly"); North Carolina v. Hudson, 731 F. Supp. 1261, 1270 (E.D.N.C. 1990) ("With good reason, however, nothing in the regulations, the statutes, or the cases interpreting either *requires* the Corps to *follow* the views of such agencies. Such a requirement would give the agencies veto power over Corps decisions." (emphasis in original)), aff'd, Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58, 61 (4th Cir. 1991).

[14] See also County of Suffolk v. Sec'y of Interior, 562 F.2d 1368, 1378 (2d Cir. 1977) ("But where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the 'rule of reason.' Indeed, in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand."); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280-81 (9th Cir. 1973) ("If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could

(e) *Duty To Prevent Waste And The Estimates Of Future Water Supply Needs*

Finally, Alliance argues the SWCB violated state policy declared in Code § 62.1-11(C) to prevent "waste or unreasonable use" of water because the project relies on exaggerated estimates of future water needs for the municipalities in the Study Group. Here again, we need not pass judgment on whether we concur with these estimates. We ask only whether, "considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion." Va. Imps., Ltd., 41 Va. App. at 819, 589 S.E.2d at 476 (emphasis in original).

Newport News presented several studies predicting that water supply deficits would grow to as much as 30 to 40 mgd within the next several decades. Despite questioning these estimates as "a little high," the DEQ found the projections were "not so high that you would call them unreasonable." The DEQ also discounted Alliance's estimate of future deficits as too low. "The truth may be in the middle," the DEQ concluded. Working from that premise, the DEQ found the "reservoir is needed" and "this location is the right site." Accepting these recommendations, the SWCB issued the permit with conditions that provide continuing scrutiny of the rate, volume, and frequency of withdrawals.

We need not go into detail examining the merits and demerits of the various water supply and demand studies. Suffice it to say, reasonable people can disagree as to the exact magnitude of the problem; but none can deny that it exists. Any time local government makes plans for future water needs — particularly with projects of this immense scope — assumptions must be

---

ever be initiated. While appellants here have limited their argument to one specific piece of information, that does not solve the larger problem. At any point in time, there are likely to be any number of studies underway concerning a host of environmental or other societal problems. What appellants seek is for this Court to substitute its judgment for that of the Secretary, who is charged by NEPA with preparing a thorough statement of the environmental consequences of a proposed project, as to what particular information will be required to complete that statement. We decline to assume that role.").

made about population and development trends, the type and size of the evolving industrial base, and the viability of conservation efforts. That those assumptions can be criticized as imperfect, by itself, proves nothing. Commendable foresight necessarily involves some attempt at forecasting the future, an inexact effort under the best of conditions. What may be pure guesswork to some is an educated estimate to others.

Our duty of appellate oversight must be discharged with the appropriate deference to the SWCB — the state policy maker tasked by the General Assembly with the "responsibility for planning the development, conservation and utilization of Virginia's water resources." Code § 62.1-44.36. From this perspective, we have reviewed the factual basis for the SWCB's decision to accept the projections offered in support of the project. We find nothing in these assumptions that can be fairly dismissed as unreasonable or irrational. Given the permit condition authorizing the SWCB to regulate withdrawal volume as new demand data becomes available, we cannot say that the SWCB violated its statutory duty to protect the Commonwealth's waters from being wasted or unreasonably used.

## VI.  CONCLUSION

In this consolidated appeal, we hold that:

- The VAPA authorizes judicial review of the SWCB's decision to issue the permit in this case. For this reason, we deny the Commonwealth's motion to dismiss on sovereign immunity grounds.

- The State Water Control Law does not authorize the SWCB to adjudicate the Tribe's freestanding treaty claim. Nor does the VAPA permit the circuit court to do so on appeal of the SWCB's permit decision. Thus, neither erred by declining to exercise such jurisdiction.

- We do not address whether the circuit court, in its general non-VAPA jurisdiction, erroneously applied state law to the treaty claim and interpreted Article XVIII to require all treaty disputes to be resolved by the Governor without the possibility of judicial review. This portion of the appeal will be transferred to the Virginia Supreme Court pursuant to Code § 8.01-677.1.

▪ The circuit court did not err in affirming the SWCB's decision under the VAPA. The SWCB applied the correct legal standard and rested its decision upon substantial evidence.

In sum, we affirm all aspects of the circuit court's final decision over which we have appellate jurisdiction and transfer the remainder to the Virginia Supreme Court.

<u>Affirmed in part and transferred in part</u>.