COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Willis and Elder
Argued at Salem, Virginia


CONSOLIDATION COAL COMPANY
                                             OPINION BY
v.    Record No. 0570-00-3          JUDGE JERE M. H. WILLIS, JR.
                                          NOVEMBER 21, 2000
DEPARTMENT OF MINES, MINERALS
 AND ENERGY, DIVISION OF MINED
 LAND RECLAMATION AND
 GRADY HORN AND ELLA HORN, INTERVENORS


             FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
                      Keary R. Williams, Judge

        Monroe Jamison for appellant.

        John C. Wilkinson, Assistant Attorney General
        (Mark L. Earley, Attorney General; Richard B.
        Zorn, Senior Assistant Attorney General, on
        brief), for appellee Department of Mines,
        Minerals and Energy, Division of Mined Land
        Reclamation.

        No brief or argument for appellees Grady
        Horn and Ella Horn, Intervenors.


     Consolidation Coal Company (CCC) appeals a judgment

affirming issuance by the Department of Mines, Minerals and

Energy (DMME), Division of Mined Land Reclamation (DMLR), of a

subsidence order requiring CCC to repair, replace or compensate

damage to structures caused by its underground mining.  CCC

contends:  (1) that the agency's finding that subsidence

resulting from CCC's operation caused the subject structural

damage is not supported by substantial evidence in the record,

and (2) that the agency's hearing officer impermissibly relied on matters outside of the record by assuming that an agency employee was an expert on subsidence damage.  We find no error and affirm the judgment of the trial court.

## I.  BACKGROUND

CCC conducts underground mining operations in Buchanan County, Virginia, pursuant to a DMME permit it acquired in 1995. The Horns and the Comptons own homes located above these operations.  In 1996, the Horns filed a complaint alleging subsidence damage to their home and yard.  While investigating the Horns' complaint, the agency's inspector was notified that the Comptons suspected subsidence damage to their home as well. The inspector investigated and reported on both claims.

In April, 1997, the DMLR issued Technical Report #1867, which concluded that underground mining operations by CCC caused the subsidence that damaged both the Horn and Compton homes.  An October, 1997, addendum confirmed the report's initial conclusion that subsidence resulting from CCC's Buchanan No. 1 underground mine caused structural damage to the Horn and Compton homes.  Pursuant to Virginia Coal Surface Mining Reclamation Regulations, DMLR issued a subsidence order requiring CCC to repair, replace or compensate the Horns and Comptons for damage caused by CCC's underground mining.

On March 12, 1998, upon CCC's request, DMLR conducted an administrative hearing, allowing the Horns and Comptons to

intervene. On June 18, 1998, after receiving evidence and memoranda of law, the hearing officer issued an opinion concluding that DMLR "properly issued the subsidence order." Based on the evidence presented, including the testimony of DMLR's Chief Engineer, the hearing officer concluded that "[u]nderground mining by [CCC's] Buchanan No. 1 mine caused structural damage to the residences of the Horns and Comptons." On June 22, 1998, the deputy director of DMME adopted the hearing officer's "Findings of Facts" and "Conclusions of Law" as the agency's final decision and affirmed DMLR's issuance of the subsidence order. CCC requested review. On September 11, 1998, the deputy director, after hearing oral and written argument by CCC, found no error and affirmed the hearing officer's opinion.

On November 9, 1998, CCC filed in the trial court a petition for appeal. The trial court denied CCC's petition but suspended DMLR's decision pending remand to the hearing officer for further explanation of his findings. On February 14, 2000, upon review of the hearing officer's findings and further explanation, the trial court affirmed DMLR's decision and entered an order dismissing CCC's appeal. CCC contends that the evidence was insufficient to support the hearing officer's conclusion that subsidence caused the damage to the Horn and Compton homes and that the hearing officer impermissibly relied

upon matters outside the record by assuming that an agency employee was an expert on subsidence damage.

## II. SUBSTANTIAL EVIDENCE

In reviewing an agency decision, "[t]he scope of court review of a litigated issue under the [Administrative Process Act (APA)] is limited to determination [of] whether there was substantial evidence in the agency record to support the decision." State Bd. of Health v. Godfrey, 223 Va. 423, 433, 290 S.E.2d 875, 880 (1982) (citing Code § 9-6.14:17). The substantial evidence standard is "designed to give great stability and finality to the fact-findings of an administrative agency." Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 135 (1983). A trial court may reject the findings of fact "'only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion.'" Id. (quoting B. Mezines, Administrative Law § 51.01 (1981)). The burden of proof rests upon the party challenging an agency decision to show that the record lacks substantial evidence to support the decision. See Code § 9-6.14:17.

The trial court found substantial evidence in the record supporting the deputy director's affirmance of the hearing officer's findings that CCC's underground mining caused subsidence damage to the Horn and Compton homes. The record supports that determination.

DMLR introduced before the hearing officer Technical Report #1867 that had been issued by the DMLR upon investigation of the Horns' complaint.  This report analyzed information from the Horns and the Comptons, geologic maps for the Keen Mountain quadrangle, CCC's maps on all known mining near the homes, and information gained from the technical field investigation conducted by Robert Stimpson, who visited the homes and took photographs of the damage.  DMLR determined that CCC completed its longwall extraction mining closest to the Horn residence on December 31, 1995.  Structural damage to the Horn residence appeared in the spring and summer of 1996.  CCC completed its longwall extraction mining closest to the Compton residence on May 31, 1995.  Structural damage to the Compton residence appeared in the spring and fall of 1996.  In discussing the Horn residence, the report stated, "[f]or the longwall completed May 31, 1995 . . . the draw angle is 24.4 degrees . . . . For the longwall completed December 31, 1995 . . . the draw angle is 19.1 degrees."[1]

In discussing the Compton residence, the report stated, "[f]or the longwall completed May 31, 1995 . . . the draw angle

------

[1] The draw angle is the angle from vertical defined from the edge of mining to the point on the surface where subsidence becomes negligible.  As used in this discussion, the term refers to the angle from vertical from the edge of mining to the subject damaged.

calculates as 22 degrees . . . . For the longwall completed December 31, 1995 . . . the draw angle is 24 degrees."

The report further determined that, "[t]he draw angle can be affected by many variables such as lithhology, Geologic structures, and changes in longwall panel designs."

The report concluded that, "[b]ased on information examined during the technical investigation, there is evidence that underground mining operations conducted by [CCC] damaged the [Horn and Compton] residences."

CCC requested an informal hearing to challenge the findings of Technical Report #1867. Proposing various models, it argued that damage outside a draw angle of 15 degrees could not be attributed to its mine. Following that hearing, an addendum was filed stating, "[t]he Division feels that the 15 degree draw angle is not absolute [and] [a]t the angles calculated in the original report, the amount of settlement is expected to be slight and damages mostly cosmetic."

The addendum concluded, "[t]he original investigation documented some damages that are typical of subsidence, the damages occurred a short time after mining, and the draw angle is affected by several variables. For these reasons it is felt that subsidence occurred under the complaint areas and the original conclusion is valid."

Other evidence presented to the hearing officer included testimony by Lester Vincent, DMLR's Chief Engineer, who had over

twenty years experience as a licensed professional engineer in the fields of mining and environmental engineering. Mr. Vincent testified that he had reviewed the agency's angle of draw analysis, which was the basis for the subsidence order. He explained that modeling methods give only a predicted angle of subsidence and that actual subsidence events can be affected by multiple variables, which could account for the extended angles occurring in this case.

Contrary to CCC's assertions that DMLR presented no evidence of the existence of such variables, Mr. Vincent testified that core hole samples taken by DMLR near the residences showed a five percent to six percent variability in hard/soft rock ratio. He testified that these variables could extend a predicted angle of draw by one or two degrees.

Called by CCC, Vincent Scovazzo, a geologist, mining engineer, expert in rock mechanics, and Ph.D. candidate in soil and foundation engineering, testified that the damages at the Horn and Compton homes were not consistent with damages caused by subsidence. Mr. Scovazzo determined in a prior study that the angle of draw for CCC's mine was, at a maximum, 11.7 degrees. He admitted, however, that this angle of draw was based on a model not recognized by the Office of Surface Mining and Reclamation and that several other acceptable models are in use.

The hearing officer recognized that "this [was] a very close case from the evidence presented." He weighed the testimony, determined the credibility of the witnesses and resolved the conflict in favor of the DMLR. The record supports this ruling. CCC has failed to show that a reasonable mind would necessarily disagree with the hearing officer's findings. See Bias, 226 Va. at 266, 308 S.E.2d at 125. Because the courts review the decision of an agency with deference to its findings of fact, where substantial evidence in the record supports the agency's factual determinations, we will not substitute our own judgment for that of the agency. See Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7-8 (1988). Thus, because substantial evidence supported the hearing officer's conclusion, the trial court did not err in affirming the agency decision.

### III. MATTERS OUTSIDE OF THE RECORD

CCC next contends that the hearing officer impermissibly relied on matters outside of the record by assuming that an agency employee was an expert on subsidence damage. Because CCC failed to preserve this argument, this challenge is barred upon appeal. See Rule 5A:18.

CCC did not object to the presentation by the DMLR or to the introduction of Technical Report #1867 or its addendum. "[A]n appellant, under the provisions of the APA, may not raise issues on appeal from an administrative agency to the circuit

court that it did not submit to the agency for the agency's consideration." Pence Holdings, Inc. v. Auto Center, Inc., 19 Va. App. 703, 707, 454 S.E.2d 732, 734 (1995). Having failed to raise this issue before the administrative agency, CCC is precluded from raising it on appeal. Moreover, the record reflects no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

Because substantial evidence in the record supports the hearing officer's conclusion that the agency proved subsidence caused the damage to the Horn and Compton homes, the trial court's order upholding that agency's determination is affirmed.

Affirmed.