COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Felton, Judges Frank and Powell
Argued at Chesapeake, Virginia


COMMISSIONER, VIRGINIA DEPARTMENT
  OF SOCIAL SERVICES
                                                                    OPINION BY
v.        Record No. 0152-09-1                          JUDGE CLEO E. POWELL
                                                                    OCTOBER 13, 2009
TIMOTHY J. FULTON


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Stephen C. Mahan, Judge

        Cheryl A. Wilkerson, Senior Assistant Attorney General (William
        C. Mims, Attorney General; David E. Johnson, Deputy Attorney
        General; Kim F. Piner, Senior Assistant Attorney General, on
        briefs), for appellant.

        Melinda R. Glaubke (Slipow, Robusto & Kellam, on brief), for
        appellee.


        The Commissioner of the Virginia Department of Social Services (DSS) appeals from a

decision of the Circuit Court of the City of Virginia Beach (circuit court) finding that there is not

substantial evidence in the agency's record to support its March 4, 2004 "founded disposition"

and ordering that this decision be amended to "unfounded" and that all records concerning the

investigation and disposition of the complaint be purged from the central registry and the records

of the Virginia Beach Department of Social Services.  The Commissioner alleges that the circuit

court erred in determining that the agency's record lacked substantial evidence to support a

finding of sexual abuse.  On cross-appeal, Timothy J. Fulton contends that the investigator's

failure to tape record the interviews with the alleged victim is reversible error.  For the reasons

that follow, we reverse the circuit court's judgment and remand for entry of an order consistent

with this opinion.

I.  BACKGROUND

On the morning of November 26, 2002, the child protective services unit of the local department received a complaint that A.J., a twelve-year-old girl, may have been sexually abused by Fulton, the father of one of A.J.'s friends ("H.M."), while she was in his care.  In response, Shana Prohofsky, a social worker with the local department, and Detectives Ron D. Montrose and Lisa Krisik of the Virginia Beach Police Department conducted a joint investigation of the complaint against Fulton.

After A.J. and her father filed the complaint against Fulton, A.J.'s father took her to the Virginia Center for Women for a SANE examination.  There, Detective Montrose and Prohofsky conducted an initial interview of A.J., which was not recorded.  In that interview, A.J. told her interviewers that she had gone over to her friend H.M.'s house after school and spent the night.  Around 1:00 or 1:15 a.m., Fulton came into H.M.'s room, where the girls were sleeping, to check on them.  A.J. told Fulton that her wrist hurt, and he brought her "a slippery blue clear oval-like capsule and a white circular pill, resembling a really big Tylenol."  A.J., who was "really sleepy" both before and after taking the pills, said that H.M. was awake when she took the pills but soon fell back asleep.  A.J. told her interviewers that she was soon back asleep as well.  She said that she awoke awhile later when she felt something hard in her mouth.  As A.J. squinted, she saw Fulton's stomach and "some parts of his penis" in front of her.  She opened her eyes and saw Fulton standing before her with his red boxer shorts around his ankles.  A.J. closed her eyes and yawned to "get away."  When she opened her eyes, Fulton had raised his boxer shorts and was petting one of the family's rottweilers that was lying down on H.M.'s bed.  H.M. was now awake and also petting the dog.  Before Fulton left H.M.'s room, A.J. said that she wanted to call her father, so Fulton brought her a phone.  A.J. said that she told her father that she really wanted to come home, and her father said that was fine as long as Fulton agreed.  Because A.J.'s father was

sleeping, Fulton drove A.J. home.  After Fulton left, A.J. told her father what Fulton had done to her and her father called the police.

Later that day, A.J. spoke with Prohofsky again.  This time Detective Krisik joined them. A.J. told the interviewers substantially the same version of events that she previously described to her father and repeated to Prohofsky and Detective Montrose.

A.J.'s father also spoke with Prohofsky and Detective Montrose on November 26, 2002. In that interview, he told them that after she came home from Fulton's home, A.J. came into his room and sat on the edge of his bed.  He was still asleep at the time.  He said that A.J., who was "fidgety" and "nervous," began crying.  She did not want to talk but then made a hand gesture to indicate what she was trying to say.  A.J.'s father replied, "please don't tell me he put his penis in your mouth."  He said that A.J. then finally told him what happened and he decided to call the police.

Prohofsky and Detective Krisik interviewed H.M. at her school at approximately 9:45 a.m. on November 26, 2002.  H.M. told her interviewers that A.J. is her best friend and that A.J. visits her home every other day.  H.M. said that A.J. was at her house the night before while their fathers went out, but that A.J. had intended to return home when her father came to pick her up.  During this time, H.M.'s stepbrother taught the girls to box, and during that lesson, A.J. injured her wrist.  H.M. said that she and A.J. fell asleep in Fulton's bedroom,[1] and when he returned home, he woke the girls to tell them to go to H.M.'s room.  A.J. asked to go home, but she was unable to reach her father on the phone.  H.M. said that her father took A.J. home. When interviewed, H.M. said that she knew A.J. was absent from school that morning but did not know why.  H.M. also told the interviewers that "no one has . . . showed her their [sic] private parts" and that "she does not know anyone who this has happened to."

---

[1] H.M. also said that she "never really fell asleep while [A.J.] was at her house."

Carolyn Dressen, a roommate who lived with A.J. and her father, also spoke with Prohofsky and Detective Krisik. She said that she called Fulton at 7:30 a.m. to "figure out what was going on." Fulton told her he did not know what was going on and that A.J.'s father would be over shortly to pick him up for work. Dressen told Fulton what A.J. had alleged. Dressen stated that she heard Fulton tell H.M. what A.J. claimed happened and then Fulton told her that H.M. said she was awake and nothing happened. Dressen stated that neither H.M. nor A.J. had ever lied to her. She added that she believes that A.J. is generally very truthful, especially with her father.

During the investigation, Prohofsky and Detective Krisik also interviewed Fulton. In his interview, Fulton told police that he had been out drinking with A.J.'s father and others the night before. When he arrived home around 1:15 a.m., the girls were asleep in his room. He woke them up and told A.J. that her father was on his way to pick her up. The girls went into H.M.'s room. He denied knowing that A.J. had hurt her wrist or giving her medicine. When A.J.'s father never arrived, she asked Fulton to call her father. Fulton asked A.J what she wanted him to do when A.J.'s father did not answer the phone. She informed him that she wanted to go home, and he took her home. Fulton said that A.J. always becomes angry when her father fails to pick her up as promised.

At the conclusion of her investigation, Prohofsky determined that the complaint of sexual abuse was founded. Specifically, she found that A.J.'s

> behaviors and emotions are consistent with that of a victim. Additionally, according to both [A.J.] and [H.M.], [A.J.] has had no other sexual contact. [A.J.] was able to describe the sexual act in detail, including sensory descriptions. [A.J.] had no motive for fabricating an allegation of sexual abuse. . . . As a result of [A.J.] coming forward with these allegations, [A.J.] lost her best friend.

Prohofsky further concluded that Fulton's memory of the night was impaired by the alcohol he consumed because he was unable to recall events that A.J. described and H.M. confirmed.

- 4 -

Prohofsky notified Fulton by letter dated January 24, 2003 of the result of her investigation. On February 11, 2003, Fulton noted his appeal, which was stayed during the pendency of a related criminal matter.

A preliminary hearing for Fulton's criminal charge was held in Virginia Beach Juvenile and Domestic Relations District Court on April 9, 2003. During that hearing, A.J. again repeated the account that she told her father and investigators. On cross-examination, A.J. said that she knew how serious it was to allege that someone committed a sexual offense when challenged as to her past veracity. She admitted that she erroneously told neighborhood boys and a friend of hers that a neighbor had raped her mother. She stated that she did so because that is what her mother told her. A.J. also admitted that she thought her dad drank too much and spent too much time with Fulton, his drinking companion. A.J. said that she and H.M. never left H.M.'s room after 7:00 that night. Though other inconsistencies between A.J.'s testimony and her interviews with the investigators were revealed on cross-examination, at the conclusion of the hearing, the judge certified the case to the grand jury.

Pursuant to Fulton's administrative appeal, a hearing was held before a hearing officer on July 9, 2003. On July 14, 2003, the hearing officer for DSS upheld the investigator's "founded level one" disposition of sexual abuse. Specifically, the hearing officer noted that there were discrepancies in both Fulton's and A.J.'s versions of events. That said, the officer concluded that the evidence meets the preponderance of the evidence standard because:

1. The DNA report submitted presupposes that Fulton had not previously showered. The report does not indicate that the underwear tested was the one he wore the night of the alleged abuse.

2. [A.J.] submitted to a full sexual assault examination and did not recant any of her statements.

3. [A.J.] was consistent with the details surrounding the actual assault. She described [Fulton's] position over her, the

- 5 -

underwear down around [Fulton's] legs, seeing mostly [Fulton's] stomach and a little of [Fulton's] penis, the smell of alcohol, and the texture of the object in her mouth. She describes [Fulton's] action afterward in petting the dog before leaving the room.

4. [A.J.] told her father immediately about the experience and was observed to be emotionally distraught by [her father] and Carolyn Dressen.

The hearing officer discounted the fact that H.M.'s testimony did not support A.J.'s recollection because "[H.M.] was only interviewed after she would have had time to learn [Fulton's] version of events."

On July 21, 2003, Fulton appealed the hearing officer's determination to the Commissioner. During that hearing, both Fulton and DSS presented additional evidence and argument. In her March 4, 2004 opinion, the DSS hearing officer appointed by the Commissioner held that "based on the evidence contained in the record and presented at the hearing, the disposition of 'founded – sexual abuse (intercourse and sodomy) – level one' of [A.J.] by Timothy Fulton is sustained." To support this determination, the hearing officer found that

> [o]n the night of November 25, 2002, [H.M.] invited [A.J.] to come to her house after school. Timothy Fulton left the house at about 5:30 p.m. to meet [A.J.'s father] and other friends to go drinking. [Joshua] . . . , [H.M.'s] half-brother, age 22, and his girlfriend . . . were at the Fulton home and supervised [A.J.] and [H.M.]. [H.M.] and [A.J.] made furniture for [H.M.'s] dollhouse, did homework and watched television.
>
> [A.J.'s father] was supposed to pick [A.J.] up from the Fulton house on his way home. [A.J.] routinely became upset if her father failed to pick her up after promising that he would.
>
> At approximately 11:00, [H.M.] and [A.J.] fell asleep in Timothy Fulton's room while watching television. While out with [A.J.'s father], Timothy Fulton drank at least six bottles of beer. When Timothy Fulton came home at approximately 1:00, he found the girls asleep in his room. He woke them up, and they went to

[H.M.'s] room, where [H.M.] lay down on her bed and [A.J.] lay down on a couch near the bed.

After [H.M.] and [A.J.] went to sleep, Timothy Fulton went into [H.M.'s] room, and put his penis into [A.J.'s] mouth. This action awakened [A.J.], who yawned as if she were awakening. Timothy Fulton removed his penis and dressed himself. He petted one of the family's dogs which was lying on [H.M.'s] bed. As he was leaving the room, [A.J.] said she wanted to go home, as it had become apparent to her that her father would not come to pick her up.

Timothy Fulton gave [A.J.] his cell phone and she called her father, however, she could not get him to answer the phone. [A.J.'s father] was home but asleep and did not answer the phone. [A.J.] told Timothy Fulton that she wished to go home and he offered to drive her home.

Timothy Fulton drove [A.J.] to her house, and went inside the house to tell [A.J.'s father] that his daughter was home. As soon as Timothy Fulton left, [A.J.] told her father that Timothy Fulton had put his penis in her mouth.

Carolyn Dressen, a lodger in [A.J.'s] house, was awakened after 2:00 a.m. by [A.J.'s father], who was angry and upset. [A.J.'s father] told Carolyn Dressen that Timothy Fulton put his penis in [A.J.'s] mouth. Carolyn Dressen went to check on [A.J.] and found that she was visibly upset and had been crying.

[A.J.'s father] drove to the Fulton home, where he awakened Joshua . . . by banging on the door. Joshua told [A.J.'s father] that his father, Timothy Fulton, was "passed out" and could not speak to him.

Early the next morning, Carolyn Dressen called Timothy Fulton on his cell phone and advised him that [A.J.] had made an allegation of "something sexual" against him. Her phone call was prior to Timothy Fulton being interviewed by the police. Timothy Fulton relayed the information to his daughter, [H.M.]. Carolyn Dressen could hear [H.M.'s] voice saying, "Nothing happened."

Forensic tests did not reveal the presence of any sperm in [A.J.'s] mouth.

The opinion concluded that "[t]he record contains a preponderance of evidence that Timothy Fulton sexually abused [A.J.], causing serious harm to her." In so finding, the DSS opined:

As [the judge] noted at the preliminary hearing, the case is not without problems – chiefly the lack of forensic evidence and the question of the complaining witness's credibility. The standard of proof being a preponderance of the evidence, those problems weigh less heavily on the likelihood that [Fulton] acted as [A.J.] alleged. [A.J.] was regarded by Carolyn Dressen as a truthful child. As it turns out, she did not fabricate a prior allegation of rape, she repeated something she had been told and which she believed to be true. Many adult sexual assault victims cannot recall accurately the layout of a room where the assault occurred. In the absence of a clear motive on the part of the alleged victim to invent an allegation, and taking into account her age and her relationship to . . . [Fulton's] daughter, I conclude that it is more likely than not that the incident occurred as [A.J.] described, and the disposition will be sustained.

Fulton appealed the agency's decision to the circuit court. At a hearing on the matter on August 24, 2004, the trial court repeatedly asked the parties for argument on what "substantial evidence" meant. DSS asserted that under the standard of review that the circuit court must apply, the court is bound to uphold the agency's determination, no matter how uncorroborated or unsubstantiated, unless a reasonable mind would necessarily come to a different conclusion. The circuit court questioned whether the record indicated that A.J. specifically said Fulton put his penis in her mouth, but DSS asserted that the "hearing officer necessarily [found] that – one of her factual findings is that it was Fulton's penis." The circuit court indicated that it could not find evidence to support this factual finding by the hearing officer.

In an order entered December 15, 2008, the circuit court held that "there were erroneous findings of fact and that reasonable minds, considering the actual facts, would necessarily have come to a different conclusion[.]" The circuit court thus concluded that there was "not substantial evidence in the agency record to support the March 4, 2004 decision of the Commissioner," and ordered that the agency's determination be changed to "unfounded" and the records purged.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence in the Administrative Record to Support the Disposition of "Founded-Sexual Abuse-Level 1"

As outlined in Code§ 63.2-1526(B), the Administrative Process Act (APA), Code §§ 2.2-4000 to 2.2-4033, governs judicial review when DSS makes a disposition of founded child abuse.  Jones v. West, 46 Va. App. 309, 322-23, 616 S.E.2d 790, 797 (2005).

> Accordingly, "the burden is upon the appealing party to demonstrate error."  Carter v. Gordon, 28 Va. App. 133, 141, 502 S.E.2d 697, 700-01 (1998); Code § 2.2-4027.  The reviewing court will view "the facts in the light most favorable to sustaining the [agency's] action," Atkinson v. Virginia Alcohol Beverage Control Comm'n, 1 Va. App. 172, 176, 336 S.E.2d 527, 530 (1985), and "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted," Code § 2.2-4027.  Moreover, the review of an agency's factual findings "is limited to determining whether substantial evidence in the agency record supports its decision," Avante at Lynchburg, Inc. v. Teefey, 28 Va. App. 156, 160, 502 S.E.2d 708, 710 (1998), and "great deference is to be accorded the agency decision," Holtzman Oil v. Commonwealth, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000).

Id.  "[T]he circuit court's role in an appeal from an agency decision is equivalent to an appellate court's role in an appeal from a trial court.  In this sense, the General Assembly has provided that a circuit court acts as an appellate tribunal."  School Bd. of County of York v. Nicely, 12 Va. App. 1051, 1062, 408 S.E.2d 545, 551 (1991).  "The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion."  Johnston-Willis v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988) (citations omitted).  It is not the trial court's role to determine the credibility of the witnesses.

Here, A.J. alleged that Fulton inserted his penis into her mouth as she slept and that he removed it only when she awoke and faked a yawn. She immediately reported the incident to her father. A.J. did not have a reputation for lying. Though Fulton denied the allegations and A.J.'s claim was not supported by forensic evidence, the agency acting as the fact finder determined that the claim was "founded," meaning that the agency determined that "a review of the facts [showed] by a preponderance of the evidence that child abuse . . . has occurred." 22 VAC 40-705-10. Based on the evidence in the record, it cannot be said that after reviewing the record as a whole a reasonable mind would inevitably or unavoidably determine that A.J.'s allegations are false. Thus, the trial court erred in finding that there is not substantial evidence and we reverse the trial court's decision.

### B. Whether the Failure to Tape Record the Interviews with the Alleged Victim is Reversible Error

On cross-appeal, Fulton contends that the DSS committed reversible error by not tape recording the interviews with the alleged victim. He concedes that this issue was not preserved at trial but "asserts there is good cause shown and the ends of justice exception to Rule 5A:18 . . . applies." The Court of Appeals will not consider a claim of trial court error as a ground for reversal "where no timely objection was made, except to attain the ends of justice." Marshall v. Commonwealth, 26 Va. App. 627, 636, 496 S.E.2d 120, 125 (1998) (citing Rule 5A:18). "To be timely, an objection must be made when the occasion arises -- at the time the evidence is offered or the statement made." Marlowe v. Commonwealth, 2 Va. App. 619, 621, 347 S.E.2d 167, 168 (1986). Because the objection was not timely, Rule 5A:18 bars our consideration of this issue on appeal.

Rule 5A:18 allows exceptions for "good cause shown," Luck v. Commonwealth, 32 Va. App. 827, 834, 531 S.E.2d 41, 44 (2000) (holding that where "the defendant had the opportunity to object but elected not to do so, his claim is not preserved"), or to meet the "ends

- 10 -

of justice," Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) (holding that "[i]n order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred"). Fulton "asserts there is good cause shown and the ends of justice exception to Rule 5A:18 . . . applies" because he could not have made this argument at trial as the case upon which his argument is based, Jones, 46 Va. App. 309, 616 S.E.2d 790, was decided after Fulton's case was heard. Fulton does not contend that the applicable DSS regulation was not in effect at the time his case was before the agency or on appeal to the circuit court and, indeed, Jones did not change existing law; it simply interpreted an existing DSS regulation. Id. at 322-33, 616 S.E.2d at 797-802. Thus, the law applicable to Fulton's claim that the DSS interviews with A.J. should have been recorded did not change. Given this circumstance, we cannot find that the ends of justice or good cause exceptions to Rule 5A:18 allow our consideration of the issue on appeal. See Talbert v. Commonwealth, 17 Va. App. 239, 246, 436 S.E.2d 286, 290 (1993).

### III. CONCLUSION

As Fulton's question presented on cross-appeal was not properly preserved and does not warrant the application of either the "ends of justice" or "good cause shown" exception, we decline to consider it. Because the agency's record contains substantial evidence to support its finding of founded sexual abuse, we reverse the decision of the circuit court and remand for entry of an order consistent with this opinion.

Reversed and remanded.