COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Athey and Callins
Argued at Arlington, Virginia

UNPUBLISHED

AYMAN AHMED SALEM, DVM

MEMORANDUM OPINION* BY
v.      Record No. 1437-23-4          JUDGE DOMINIQUE A. CALLINS
                                      MARCH 11, 2025

VIRGINIA BOARD OF VETERINARY MEDICINE

FROM THE CIRCUIT COURT OF FREDERICK COUNTY
Brian M. Madden, Judge

Michael E. Thorsen (Emily K. Blake; McGavin, Boyce, Bardot,
Thorsen & Katz, P.C., on briefs), for appellant.

James E. Rutkowski, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Robert B. Bell, Deputy Attorney
General; Allyson K. Tysinger, Senior Assistant Attorney General;
Laura Ann Booberg, Senior Assistant Attorney General, on brief),
for appellee.

Dr. Ayman Ahmed Salem appeals the circuit court's judgment affirming the decision of

the Virginia Board of Veterinary Medicine (the "Board") suspending his license to practice

veterinary medicine in Virginia. Dr. Salem argues that the Board erred in finding that he

engaged in unprofessional conduct by violating certain provisions of the Regulations Governing

the Practice of Veterinary Medicine (the "Regulations") because the Board did not hear expert

testimony establishing that he violated the Regulations. Dr. Salem also argues that the Board's

findings were unsupported by sufficient factual evidence. For the following reasons, we affirm

the circuit court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

Prior to the current proceedings, Dr. Salem was a licensed veterinarian who operated two veterinary practices in Virginia: Silver Spring Veterinary Hospital in Winchester and Harrisonburg Veterinary Emergency Clinic in Harrisonburg. Between August 2006 and January 2022, the Board imposed discipline on Dr. Salem several times, including placing him on probation from October 24, 2012, through September 23, 2013, and issuing him multiple reprimands.

In 2021, the Virginia Department of Health Professions[2] received complaints from five dog owners who had brought their dogs to Dr. Salem for emergency medical care. After further investigation, the Board voted to summarily suspend Dr. Salem's license to practice veterinary medicine in Virginia, pending a hearing. The Board subsequently sent Dr. Salem a notice of formal administrative hearing with a statement of allegations against him and the specific regulations the Board believed he had violated. A two-day hearing was conducted from July 28 to 29, 2022, before the Board president and four other Board members, all of whom were licensed veterinarians. During the hearing, the Board heard evidence on Dr. Salem's medical treatment of the five dogs involved in the complaints: Tucker, Cal, Levi, Addison, and Snoopy.

## I. Tucker

Curt Shade testified that he sought medical care for his dog Tucker after noticing that Tucker was unable to urinate. Shade's regular veterinarian was unavailable, so he took Tucker to Dr. Salem's Winchester hospital. Dr. Salem indicated to Shade that Tucker likely had bladder stones. Shade observed Dr. Salem attempt several times to insert a catheter into Tucker's

---

[1] "On appeal, we view the evidence in the light most favorable to the Board, the party prevailing below." *Doe v. Va. Bd. of Dentistry*, 52 Va. App. 166, 170 (2008).

[2] The Virginia Board of Veterinary Medicine is a regulatory board within the Department of Health Professions. Code § 54.1-2503.

urethra. Dr. Salem recommended surgery, assuring Shade that he had experience with the "routine" procedure. Shade left Tucker in Dr. Salem's care. Several hours later, Dr. Salem called Shade saying, "he couldn't finish the surgery" and that Shade "needed to take [Tucker] somewhere immediately or he was going to die." After returning to Dr. Salem's hospital, Shade found Tucker "barely breathing" and "lifeless." Shade immediately took Tucker to VCA Animal Emergency Critical Care in Leesburg, where Shade learned that Tucker was "going blind," his "vitals were dangerously low," and he needed another surgery.

Dr. Sienna Church, an emergency veterinarian at VCA, treated Tucker. She explained that Dr. Salem had referred Shade to her facility and called her to inform her that Shade was on the way. During that conversation, Dr. Salem advised Dr. Church of which drugs he had used to sedate Tucker. Dr. Church testified that Tucker arrived at VCA in "critical" condition. Dr. Church observed that Tucker was "[s]everely obtunded," meaning that "he had no gag reflex," "very weak pulse," and no "pupillary, light reflexes," and Dr. Church was "unable to obtain a blood pressure." Based on Tucker's condition and Dr. Salem's description of the drugs he used for Tucker's surgery, Dr. Church concluded that Tucker was suffering from "[o]ver sedation." After Dr. Church administered a reversal agent, Tucker recovered his sight and mental awareness after "a couple of days." Tests revealed that Tucker "had urine in his abdomen," so Dr. Church recommended surgery. The surgeon who performed Tucker's operation found "multiple stones" in the urethra, "multiple blood clots" in the bladder, and saw that the urinary bladder incision created in the prior surgery by Dr. Salem was leaking. Dr. Church emphasized that after this kind of surgery "you should be making sure that all stones are removed."

Dr. Salem testified that while performing surgery on Tucker, the catheter became stuck and he was unable to pass it, causing him to become "very upset." Dr. Salem explained that he

became "rushed" while closing the incision. Dr. Salem acknowledged that leakage is a typical complication of the type of surgery he performed on Tucker and that he was "supposed to" conduct a leakage test but was "not able to perform" the test on Tucker. Dr. Salem denied over-sedating Tucker and claimed that Tucker had merely reacted badly to a normal dose of anesthesia. When asked about the allegation that he did not maintain complete treatment records of Tucker, Dr. Salem answered that he "did not complete it because the dog was feral to the surgery."

## II. Cal

Taylor Swisher testified that she took her dog Cal to Dr. Salem's Harrisonburg clinic after Cal started vomiting "bowel yellow" liquid and became very lethargic and weak. Because Cal's condition worsened on a Sunday when Cal's regular veterinary hospital was closed, Swisher took Cal to Dr. Salem's clinic. Swisher informed Dr. Salem that Cal had a history of eating foreign objects, which had resulted in Cal needing exploratory surgery in the past. After doing X-rays and a blood test on Cal, Dr. Salem told Swisher that he "didn't see anything" on the X-rays, but "the blood work was a little concerning." Dr. Salem asked to keep Cal overnight but offered no further explanation as to his concerns regarding Cal's blood test results. Swisher agreed to leave Cal overnight at the clinic. The next morning, Dr. Salem told Swisher over the phone that Swisher could pick up Cal, and Swisher's father-in-law went to the clinic to pick up Cal. Dr. Salem provided "a whole bag of medications," but did not indicate that Cal needed further care from another veterinarian. Noticing that Cal continued to appear very sick, Swisher decided to take him to Westwood Animal Hospital for additional treatment. At Westwood, further X-rays and blood tests revealed that Cal's blood work was normal, but he had a blockage. After undergoing surgery to remove a yellow rubber duck that Cal had eaten, Cal quickly recovered.

Dr. Hannah Plaugher, associate veterinarian at Westwood, examined Cal's blood work results and found them "pretty normal." In contrast, the lab results from Dr. Salem's blood test displayed Cal's calcium level as less than 1.0 mg/dL and his potassium level as higher than 10.0 mmol/L. Dr. Plaugher explained that those levels indicated "an error somewhere" because "[t]hey would not be consistent with life." Dr. Plaugher confirmed that she performed surgery on Cal to remove a yellow rubber duck from Cal's intestinal tract, after which Cal recovered well.

Dr. Salem testified that he initially described Cal's blood work as "normal," but noted that he did "have to take the potasium [sic] level in [his] consideration." When questioned on cross-examination about Cal's abnormal blood test results, Dr. Salem indicated that he "s[aw] this kind of problem once in [a] while." Although he had some concerns about the machine that he used to perform the blood test, Dr. Salem explained that the individual responsible for performing monthly maintenance on the machine had done so. Rather than retaking Cal's blood test to obtain more accurate results, Dr. Salem "prefer[red] to wait" for 24 hours because Cal was "stressed out." Despite Cal's history of requiring surgery for blockages, Dr. Salem preferred waiting 24 hours before conducting surgery on Cal "to give the patient enough time to show me he really needs the surgery." Swisher's father-in-law picked up Cal before 24 hours had passed, so Dr. Salem released Cal without taking further action. Dr. Salem's clinic also closed for the day before the 24 hours passed, meaning that Swisher had no choice in retrieving Cal at that time, but Dr. Salem explained that "[t]hey can take [Cal] to their regular vet."

### III. Levi

Jacob Bogart testified that he took his dog Levi to Dr. Salem's Harrisonburg emergency clinic after noticing Levi was lethargic, not eating, and "not being himself." After examining Levi, Dr. Salem told Bogart that Levi "had a heat stroke and needed time to cool down and get

fluids in him." Dr. Salem recommended that Bogart leave Levi at the clinic overnight for Dr. Salem to run some basic lab tests and give Levi fluids and let him rest, and Bogart agreed to Dr. Salem's treatment plan. At around eight o'clock the next morning, Dr. Salem called Bogart and told him that he needed to come pick Levi up because Dr. Salem "wanted to get home on time." During the call, Bogart "had to ask [Dr. Salem] a couple of times to get an answer" about how Levi was doing, and Dr. Salem replied that "things were fine." Because Bogart was at work, Bogart's father-in-law, Richard Malement, agreed to pick up Levi.

When Malement arrived at Dr. Salem's clinic, his interaction with Dr. Salem was "very quick." Dr. Salem did not say anything other than that "he'd been there awhile" and "he had a long drive to get home." Malement brought Levi to his house and "kept him comfortable." Bogart remained at work and allowed Levi to stay at Malement's house for a few hours. Because Dr. Salem had provided no further instructions, Bogart assumed Levi needed no additional care. Upon arriving at Malement's house to retrieve Levi, however, Bogart noticed that Levi "looked much wors[e]." Bogart took Levi to Veterinary Emergency Services in Verona, where he was examined by Dr. Renee Addison. After Dr. Addison explained that Levi was in "extremely critical" condition and would need extensive care, Bogart decided to euthanize Levi due to the severity of the medical issues and to end Levi's suffering.

Dr. Addison determined that Levi "was in extreme critical life threatening condition" when he arrived at Emergency Services. Levi was breathing heavily, unable to walk, and "pretty much unresponsive," and Dr. Addison's initial examination found that Levi had a weak pulse, a fever, and was dehydrated. Further testing revealed that Levi was hypoglycemic and displayed thrombocytopenia, kidney damage, high sodium levels, and "multiple organ dysfunction." Dr. Addison did not identify a definite diagnosis because Bogart chose to euthanize Levi, but based on her observations, she believed Levi had "some kind of sepsis." Dr. Addison attributed

Levi's deteriorating kidney and liver values, in part, to the "huge gap in treatment" between the time Levi was discharged from Dr. Salem's clinic and when he arrived in Dr. Addison's care. Dr. Addison emphasized that if Levi had been brought to her first, she "would not have let [Levi] leave my facility without follow-up instruction" and "would not have allowed [him] to go home" in his condition.

Dr. Salem testified that his initial diagnosis for Levi was heat stroke, and his primary focus was on controlling Levi's temperature. Dr. Salem acknowledged that Levi's lab results displayed high sodium levels and very low platelet levels. Dr. Salem observed that Levi had difficulty breathing, was unable to walk or stand, and started "bleeding from the rear end." Dr. Salem claimed that he had discussed a diagnosis of cancer in the spleen and liver with Bogart and that he told Malement during pick-up that Levi's condition was not good. Dr. Salem admitted that the notes he kept on Levi at the time only reflected a hyperthermia diagnosis and did not mention cancer.

## IV. Addison

Dr. Salem performed a C-section on Jennifer Trimble's pregnant dog, Addison. In administering anesthetic to Addison, Dr. Salem administered an intramuscular injection of 1.3 mL Dexdomitor 0.5 mg/mL as a pre-anesthetic and an intravenous injection of 30 mL Propofol 10 mg/mL. Dr. Salem provided the Board with an article about anesthetic protocol for C-sections in dogs as support for his decision on the amount of anesthetic he administered to Addison. The Commonwealth's counsel pointed out to Dr. Salem on cross-examination, however, that the article discussed the use of Medetomidine, or Domitor, in C-sections—not Dexdomitor as administered by Dr. Salem. Dr. Salem acknowledged that Dexdomitor "is a more significant potent drug than Domitor" but believed this was "no problem." Dr. Salem also admitted that he had administered a larger dose of Propofol than the article recommended. In

addition to the Dexdomitor and Propofol, Dr. Salem also administered Diazepam to Addison, which Dr. Salem acknowledged can have "a sedative effect."

## V. Snoopy

Dr. Joseph Sorenson brought his dog Snoopy to Dr. Salem's Harrisonburg clinic after Snoopy vomited about 20 times in a day. After running a blood test, Dr. Salem reviewed the results of the test with Dr. Sorenson. The results displayed Snoopy's calcium level as less than 1.0 mg/dL and his potassium level as higher than 10.0 mmol/L. As a physician himself, Sorenson noticed that those levels appeared to be erroneous. Dr. Salem dismissed Sorenson's concerns, however, asserting that the lab results were "what he would expect to see in a dog with [Snoopy's] symptoms." Dr. Sorenson asked Dr. Salem if it was necessary to repeat the blood work, and Dr. Salem responded that "it was not necessary." Dr. Salem recommended leaving Snoopy overnight so that Dr. Salem could administer medication and IV fluids and take X-rays, and Dr. Sorenson agreed. The next day, Dr. Sorenson called Dr. Salem and was advised that Snoopy was "doing fine" and that Dr. Sorenson could pick him up that day. Dr. Salem also prescribed medications for Snoopy. Dr. Sorenson was concerned that Dr. Salem's prescriptions for Snoopy included "multiple antibiotics" and steroid injections because "in [his] human medicine experience, that's not a typical medication given to someone who's having repeating vomiting." Because of his concerns, Dr. Sorenson took Snoopy to his regular veterinarian.

Dr. Garrett Smith, a veterinarian at Ashby Animal Clinic in Harrisonburg, examined Snoopy and found no "grossly remarkable" health issues. Dr. Sorenson informed Dr. Smith of the results of the blood test that Dr. Salem conducted. Dr. Smith had a "strong suspicion" that Dr. Salem processed the blood with an anticoagulant "that was not appropriate to run this test," thus resulting in an artificially low calcium level and an artificially elevated potassium level. Dr. Smith explained that the results were inconsistent with Snoopy's actual condition, as a

calcium level that low "would at best manifest[] with severe clinical signs . . . associated with hyperkalemia," and a potassium level that high would likely indicate "some sort of inciting cause[,] most commonly ureteral obstruction." According to Dr. Smith, both conditions would likely "not be compatible with life" and "would in all likelihood lead to cardiac arrest." Dr. Smith also noted that there appeared to be a human hand present on Snoopy's snout in the X-rays taken by Dr. Salem—a mistake that Dr. Smith believed is "part of [a veterinarian's] responsibility to mitigate . . . as best as possible." Dr. Smith ultimately associated Snoopy's symptoms with either gastritis or esophagitis and prescribed medication to manage Snoopy's ongoing vomiting. Snoopy showed no "lingering issues" of vomiting on later visits to the vet.

Dr. Salem testified that the low calcium level in Snoopy's lab results "could be error." He had planned to repeat the blood test to confirm the accuracy of the results but preferred to wait at least 24 hours because Snoopy "was already under stress." Dr. Salem explained that he did not repeat the blood test because Snoopy's condition had improved and Snoopy stopped vomiting. Dr. Salem testified that he was aware that Snoopy's vomiting was a recurring issue that had happened before. Dr. Salem prescribed Depo-Medrol because he preferred prescribing "long acting steroids" over oral medication. Dr. Salem confirmed that his hand accidentally appeared in an X-ray taken of Snoopy because he placed his hand on Snoopy's head to prevent Snoopy from moving during the X-ray, but Dr. Salem claimed he typically used X-ray protection.

## VI. The Board's Decision

During closing argument, Dr. Salem's counsel reminded the Board that the veterinarians who testified "weren't here as expert witnesses," but instead presented "their findings, their impressions." Dr. Salem's counsel argued to the Board that "[y]ou-all are the experts as to accepting the evidence and weighing it as the trier of fact . . . and providing your good judgment

- 9 -

as to whether there was a breach of the standard of care." At the conclusion of closing arguments, the Board deliberated in a closed session along with the Board's counsel and a member of the Virginia Department of Health Professions. After deliberations, the Board voted unanimously to indefinitely suspend Dr. Salem's license for not less than two years.

Following its oral decision, the Board issued an order finding Dr. Salem guilty of "unprofessional conduct" under Code § 54.1-3807(5) for multiple violations of the Regulations. The Board found that Dr. Salem "failed to adequately close the urinary bladder incision or perform leak testing" when performing surgery on Tucker and administered "inappropriately high" dosages of anesthesia, resulting in Tucker's "excessive sedation" and depressed vital signs after surgery. The Board determined that Dr. Salem's treatment of Tucker violated 18 VAC 150-20-140(7), which prohibits "[p]racticing veterinary medicine . . . in such a manner as to endanger the health and welfare of [the veterinarian's] patients or the public, or being unable to practice veterinary medicine . . . with reasonable skill and safety," and 18 VAC 150-20-140(8), which prohibits "[p]erforming surgery on animals . . . not in accordance . . . with accepted standards of practice." The Board also found that Dr. Salem failed to document his treatment of Tucker, in violation of 18 VAC 150-20-140(6) and (7) and 18 VAC 150-20-195(A)(6), (7), and (8).[3]

As to Cal, the Board found that Dr. Salem failed to repeat Cal's blood work after the lab results indicated "lethal medical concerns . . . that were not compatible with Cal's overall

---

[3] 18 VAC 150-20-140(6) prohibits veterinarians from "[v]iolating any state law, federal law, or board regulation pertaining to the practice of veterinary medicine, veterinary technology or equine dentistry." 18 VAC 150-20-195, which governs recordkeeping by veterinarians, provides that "[a] legible, daily record of each patient treated shall be maintained by the veterinarian at the registered veterinary establishment and shall include at a minimum" information such as "[t]ests and diagnostics performed and results," "[p]rocedures performed, treatment given, and results," and "[d]rugs administered, dispensed, or prescribed, including quantity, strength and dosage, and route of administration." 18 VAC 150-20-195(A)(6)-(8).

condition," and Dr. Salem instead diagnosed Cal with an electrolyte imbalance, which was "a condition that could not sufficiently explain the extreme bloodwork results." As to Levi, the Board found that Dr. Salem disregarded "significant abnormalities" in Levi's diagnostic tests and instead treated Levi only for heat stroke, while "failing to diagnose the causes of or treat the other abnormalities." The Board also found that Dr. Salem discharged Levi despite his poor condition and "failed to provide discharge instructions or to recommend that Levi's owners take him to another veterinarian for additional treatment."

As to Addison, the Board found that Dr. Salem "utilized an inappropriate anesthetic protocol" in performing the C-section on Addison. The Board determined that "[b]oth the Dexdomitor and [P]ropofol were administered at higher doses than recommended based on Addison's weight." Finally, as to Snoopy, the Board found that after the results of Snoopy's blood work indicated "lethal medical concerns . . . [in]compatible with Snoopy's overall condition," Dr. Salem failed to recognize that the results were likely inaccurate, failed to repeat the blood work to confirm the results, and prescribed Snoopy a long-acting steroid that was "inappropriate for use in a case of acute vomiting." The Board also found that Dr. Salem had failed to use protective shielding when taking Snoopy's X-rays, as evidenced by the fact that "human hands were visible in the primary [X]-ray beam." The Board determined that Dr. Salem's treatment of Cal, Levi, Addison, and Snoopy violated 18 VAC 150-20-140(7).

Dr. Salem subsequently filed a petition for appeal in the circuit court asserting that the Board erred in finding that he violated the Regulations because no expert testimony was submitted to establish the violations and there was insufficient factual evidence to support the Board's rulings. Pursuant to Code § 2.2-4027, the circuit court reviewed the Board's rulings to determine whether the Board committed an error of law and whether the Board's findings were supported by substantial evidence. After a hearing on Dr. Salem's petition, the circuit court

dismissed Dr. Salem's appeal, concluding that the Board had expert cognizance in making its decision, that the Board did not need to hear expert testimony to make its decision, and that the Board's decision was supported by clear and convincing evidence. The circuit court entered an order on July 31, 2023, affirming the Board's decision and denying Dr. Salem's appeal. This appeal followed.

ANALYSIS

I. Procedural Default

"Principles of procedural default, analogous to those governed by Rule 5A:18, apply to agency decisions judicially challenged on appeal." *New Age Care, LLC v. Juran*, 71 Va. App. 407, 430 (2020) (quoting *French v. Va. Marine Res. Comm'n*, 64 Va. App. 226, 232 n.2 (2015)). "An appellant 'may not raise issues on appeal from an administrative agency to the circuit court that it did not submit to the agency for the agency's consideration.'" *Id.* (quoting *Pence Holdings, Inc. v. Auto Ctr. Inc.*, 19 Va. App. 703, 707 (1995)). Instead, "[a] party in an administrative proceeding must make a specific, contemporaneous objection to a ruling in that proceeding in order to challenge the ruling on appeal." *Va. Bd. of Med. v. Hagmann*, 67 Va. App. 488, 513 (2017). Any argument presented for the first time to a circuit court is "not preserved for appeal, and is thus procedurally defaulted." *Doe v. Va. Bd. of Dentistry*, 52 Va. App. 166, 176 (2008). "Additionally, a litigant in . . . [an administrative] proceeding may not 'approbate and reprobate[,] . . . taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory.'" *Hagmann*, 67 Va. App. at 513 (third and fourth alterations in original) (quoting *Mar v. Malveaux*, 60 Va. App. 759, 768 (2012)).

On appeal to this Court, Dr. Salem argues that the Board erred in finding that he failed to practice veterinary medicine with "reasonable skill and safety" and in accordance with "accepted

- 12 -

standards of practice" under 18 VAC 150-20-140(7) and (8) because no expert testimony was submitted to the Board establishing the applicable standard of care. Dr. Salem asserts that in cases involving professionals alleged to have not met the requirements of their profession, expert testimony of fellow professionals is necessary to establish the applicable standard of care, and the veterinarians who testified before the Board did not do so as experts. However, Dr. Salem never once argued to the Board that it could not find that he violated the Regulations without hearing expert testimony establishing the standard of care. In fact, Dr. Salem suggested the opposite in closing argument before the Board by emphasizing that none of the veterinarians testified as expert witnesses and, instead, that the Board members "are the experts as to accepting the evidence and weighing it as the trier of fact . . . and providing your good judgment as to whether there was a breach of the standard of care." Accordingly, Dr. Salem's argument that expert testimony was necessary as a matter of law for the Board to find that he violated the Regulations is not preserved for appeal.

## II. Sufficiency of the Evidence

"On appeal of agency action under the [Virginia Administrative Process Act ("VAPA")], the party complaining bears the 'burden of demonstrat[ing] an error . . . subject to review.'" *Gaines v. Dep't of Hous. & Cmty. Dev.*, 71 Va. App. 385, 389 (2020) (alterations in original) (quoting *Hagmann*, 67 Va. App. at 499). "In a VAPA appeal, the circuit court functions as an appellate court, 'equivalent to an appellate court's role in an appeal from a trial court.'" *Id.* (quoting *Comm'r v. Fulton*, 55 Va. App. 69, 80 (2009)). The circuit court and this Court "may examine the agency decision for . . . 'the substantiality of the evidentiary support for findings of fact,'" among other things. *Hagmann*, 67 Va. App. at 499 (quoting Code § 2.2-4027).

"When an appeal presents issues of fact, we 'defer to the agency just as we would a jury or trial court.'" *PharmaCann Va., LLC v. Va. Bd. of Pharmacy*, 77 Va. App. 208, 220 (2023)

(quoting *Citland, Ltd. v. Commonwealth ex rel. Kilgore*, 45 Va. App. 268, 274 (2005)). "When reviewing an appeal from an agency decision, 'the sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision.'" *Gaines*, 71 Va. App. at 390 (quoting *Avalon Assisted Living Facilities, Inc. v. Zager*, 39 Va. App. 484, 499 (2002)). "The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion." *Id.* (quoting *Zager*, 39 Va. App. at 499-500). "In making this determination, 'the reviewing court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted.'" *Id.* (quoting *Zager*, 39 Va. App. at 500). In making its findings, the agency has the sole responsibility to "weigh[] the testimony, determine[] the credibility of the witnesses[,] and resolve[] . . . [any] conflict" in the testimony. *Consolidation Coal Co. v. Dep't of Mines*, 33 Va. App. 784, 790 (2000).

Code § 54.1-3807(5) grants the Board the authority to suspend a veterinarian's license if the veterinarian "[i]s guilty of unprofessional conduct as defined by regulations of the Board." As is relevant here, unprofessional conduct includes "[v]iolating any state law, federal law, or board regulation pertaining to the practice of veterinary medicine," 18 VAC 150-20-140(6), "[p]racticing veterinary medicine . . . in such a manner as to endanger the health and welfare of [the veterinarian's] patients or the public, or being unable to practice veterinary medicine . . . with reasonable skill and safety," 18 VAC 150-20-140(7), and "[p]erforming surgery on animals . . . not in accordance . . . with accepted standards of practice," 18 VAC 150-20-140(8). Additionally, 18 VAC 150-20-195 provides that "[a] legible, daily record of each patient treated shall be maintained by the veterinarian at the registered veterinary establishment and shall include at a minimum" information such as "[t]ests and diagnostics performed and results,"

"[p]rocedures performed, treatment given, and results," and "[d]rugs administered, dispensed, or prescribed, including quantity, strength and dosage, and route of administration." 18 VAC 150-20-195(A)(6), (7), and (8).

Dr. Salem challenges the sufficiency of the evidence supporting the Board's findings that he violated the Regulations in his treatment of Tucker, Cal, Levi, Addison, and Snoopy. We address Dr. Salem's treatment of each dog in turn.[4]

## A. Tucker

Dr. Salem argues that the evidence was insufficient to support the Board's findings that his treatment of Tucker violated 18 VAC 150-20-140(6), (7) and (8) and 18 VAC 150-20-195(A)(6), (7), and (8). Dr. Salem argues that referring Tucker to a second veterinarian after surgical complications arose with Tucker did not violate accepted standards of practice for performing surgery on animals. He also asserts that the evidence was insufficient to establish what the proper anesthesia dosages should have been for Tucker, and thus the evidence was insufficient to establish that he over-sedated Tucker. Finally, Dr. Salem argues that there was no evidence that his failure to document his treatment of Tucker endangered either the public or Tucker.

We conclude that substantial evidence in the record supports the Board's finding that Dr. Salem's treatment of Tucker endangered Tucker's health and welfare and failed to demonstrate reasonable skill and safety. After leaving Dr. Salem's hospital, Tucker was in "critical" condition and required emergency surgery. According to Dr. Church, Tucker's poor condition was at least partly due to Dr. Salem over-sedating Tucker during surgery. Dr. Church

_____

[4] Dr. Salem's fourth assignment of error generally asserts that the circuit court erred in denying his petition for appeal and affirming the Board's ruling, but he does not provide an independent rationale for this assignment of error other than the reasons stated in the first three assignments of error.

based this conclusion on Tucker's specific symptoms, Tucker's response to the reversal agent she administered, and Dr. Salem's description of the drugs he used in Tucker's surgery. Dr. Salem denied over-sedating Tucker, but the Board was entitled to give greater weight to Dr. Church's testimony, as her conclusion was based on substantial evidence. In addition, Dr. Salem failed to adequately close the urinary bladder incision he performed on Tucker and failed to perform leak testing during Tucker's surgery, causing Tucker to suffer leakage from the incision.

Substantial evidence in the record also supports the Board's finding that Dr. Salem failed to perform surgery on Tucker in accordance with accepted standards of practice. Dr. Salem admitted that he "rushed" the surgery and failed to perform a leak test, despite his knowledge that he was "supposed to" do leak testing because urine leakage is a known complication of that type of surgery. In addition, Dr. Church explained that veterinarians should "mak[e] sure that all stones are removed" after surgery, but Dr. Salem left "multiple stones" in Tucker's urethra.

Finally, substantial evidence in the record supports the Board's finding that Dr. Salem failed to document his treatment of Tucker and that such failure did not demonstrate reasonable skill and safety. Dr. Salem admitted during the hearing that he did not complete his treatment record of Tucker "because the dog was feral to the surgery." Dr. Salem's failure to document the drugs that he used in over-sedating Tucker did not demonstrate reasonable skill and safety, as such failure by a veterinarian generally hinders the ability of a subsequent veterinarian in treating a dog and compromises any investigation by a subsequent veterinarian into what caused harm to the dog.

B. Cal

Dr. Salem argues that the evidence was insufficient to support the Board's finding that his treatment of Cal violated 18 VAC 150-20-140(7). Dr. Salem argues that despite recognizing

that Cal's "bloodwork values were off," his decision to "employ[] the wait-and-see approach" and address a potential electrolyte imbalance in the meantime did not endanger Cal and did not constitute a failure to act with reasonable skill and safety.

We conclude that substantial evidence in the record supports the Board's finding that Dr. Salem's treatment of Cal endangered Cal's health and welfare and failed to demonstrate reasonable skill and safety. After keeping Cal overnight at his clinic, Dr. Salem discharged Cal with no indication that Cal needed further veterinary care, despite Cal continuing to appear sick. Dr. Salem failed to determine the cause of Cal's symptoms, leaving Cal with an unresolved internal blockage. In addition, despite admitting that he "s[aw] this kind of problem once in [a] while" regarding unexplained extreme blood test results and that he had some concerns with the blood test machine's accuracy, Dr. Salem failed to repeat Cal's blood work to confirm the abnormal results.

## C. Levi

Dr. Salem argues that the evidence was insufficient to support the Board's finding that his treatment of Levi violated 18 VAC 150-20-140(7). Dr. Salem asserts that the evidence in the record supported his diagnosis of heat stroke and that Dr. Addison never gave a specific diagnosis for Levi because Levi's owner ultimately opted for euthanasia. Dr. Salem also asserts that he did provide information about Levi's condition at discharge.

We conclude that substantial evidence in the record supports the Board's finding that Dr. Salem's treatment of Levi endangered Levi's health and welfare and failed to demonstrate reasonable skill and safety. Despite observing Levi displaying severe symptoms such as difficulty breathing, inability to walk or stand, and "bleeding from the rear end," Dr. Salem failed to diagnose or treat Levi with anything other than heat stroke. As explained by Dr. Addison, however, Levi's multiple serious symptoms strongly suggested that his medical

- 17 -

problems were more extensive than heat stroke. Dr. Salem discharged Levi without further instructions, causing Levi's owner Bogart to assume that Levi needed no further care. Dr. Salem's failure to inform Bogart of the seriousness of Levi's condition resulted in Levi receiving no further veterinary care for hours. This "huge gap in treatment" endangered Levi by allowing his condition to worsen.

Dr. Salem claimed that he did discuss the seriousness of Levi's condition on the phone with Bogart and with Bogart's father-in-law Malement during Levi's discharge from the clinic. The Board could have discredited that testimony, however, as Bogart and Malement both testified that Dr. Salem gave them no information about Levi's condition and provided no indication that Levi required further medical care. Indeed, although Dr. Salem claimed that he formed an opinion that Levi had a more serious condition such as cancer and that he made Bogart aware of this diagnosis, Dr. Salem's treatment notes from the time he treated Levi only showed a diagnosis of hyperthermia.

### D. Addison

Dr. Salem argues that the evidence was insufficient to support the Board's finding that his treatment of Addison violated 18 VAC 150-20-140(7). Dr. Salem asserts that the record contains no evidence establishing the correct dosage recommendations for anesthesia, and therefore the evidence was insufficient to establish that the anesthesia protocol he used for Addison's C-section was inappropriate.

We conclude that substantial evidence in the record supports the Board's finding that Dr. Salem's treatment of Addison endangered Addison's health and welfare and failed to demonstrate reasonable skill and safety. The record contains evidence of the specific medications and dosages Dr. Salem administered to Addison during the C-section. Dr. Salem relied on an article about proper anesthetic protocol for C-sections conducted on dogs to support

the protocol he used with Addison.[5]  Dr. Salem admitted, however, that his anesthesia protocol did not follow the recommendations of the article because instead of using Domitor, he used Dexdomitor, and he administered a larger dose of Propofol than the article recommended. Dr. Salem also admitted that the drug he chose, Dexdomitor, was more potent than Domitor. Dr. Salem also testified that he administered Diazepam, a drug with "a sedative effect," in addition to the other two drugs.  Taking "due account of . . . the experience and specialized competence of" the Board members as licensed veterinarians knowledgeable in drugs and anesthesia, the record does not demonstrate that "a reasonable mind necessarily would come to a different conclusion" from the Board's finding that Dr. Salem administered inappropriately high dosages of drugs in performing Addison's C-section.  *Gaines*, 71 Va. App. at 390 (quoting *Zager*, 39 Va. App. at 499-500).

### E.  Snoopy

Finally, Dr. Salem argues that the evidence was insufficient to support the Board's finding that his treatment of Snoopy violated 18 VAC 150-20-140(7).  Dr. Salem argues that he recognized that Snoopy's "bloodwork values might be off," but "he did not want to risk not treating the dog because the dog could die."  Dr. Salem claims that he planned to take another blood test after 24 hours, but Snoopy improved before then.  Dr. Salem asserts that the record lacks evidence that his decision to wait to retake the blood test endangered Snoopy or the public or was not reasonably safe.  Dr. Salem also argues that the record contains no evidence that the accidental placement of his hand in Snoopy's X-ray without wearing protective shielding endangered Snoopy, the public, or himself, since there is no evidence that he routinely exposes himself or others to X-rays.

---

[5] Dr. Salem provided the article as part of his written response to the Department of Health Professions investigation relating to Addison, so it was included as part of the investigative report on Addison admitted into evidence.

- 19 -

We conclude that substantial evidence in the record supports the Board's finding that Dr. Salem's treatment of Snoopy failed to demonstrate reasonable skill and safety. Dr. Salem admitted that the results of Snoopy's bloodwork "could be error." Dr. Smith explained that the inaccurate results were likely caused by Dr. Salem processing the blood with an anticoagulant "that was not appropriate to run this test." Unexplained extreme blood test results were a recurring issue at Dr. Salem's practice, as the same situation also occurred when Dr. Salem treated Cal, and Dr. Salem noted that the problem occurred "once in [a] while." Substantial evidence demonstrates that Dr. Salem displayed a lack of reasonable skill and safety by failing to repeat the blood test on Snoopy and by failing to address the recurring problem of inaccurate blood test results at his practice.

Dr. Salem's failure to use protective shielding on his hands when X-raying Snoopy further demonstrates a lack of reasonable skill and safety, as Dr. Smith testified that veterinarians have a responsibility to prevent this from occurring. The Board's ruling is supported by substantial evidence in the record, and Dr. Salem has failed to show that "a reasonable mind necessarily would" disagree with the Board's findings. *Gaines*, 71 Va. App. at 390 (quoting *Zager*, 39 Va. App. at 499-500). Thus, the circuit court did not err in affirming the Board's decision.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

- 20 -